27 So.3d 1085 (2009)
Jonathon JOHNSON and Belinda Johnson, Individually and on Behalf of their Minor Son, Garrett Johnson, Plaintiffs-Appellees
v.
MOREHOUSE GENERAL HOSPITAL, et al, Defendants-Appellant.
No. 44,798-CA.
Court of Appeal of Louisiana, Second Circuit.
December 22, 2009.
Rehearing Denied January 21, 2010.
*1088 The Law Offices of Wm. E. Bourgeois, by William E. Bourgeois, for Appellant, Morehouse Parish Hospital Service District.
Nelson & Hammons, by John L. Hammons, Guerriero & Guerriero, by Jeffrey D. Guerriero, for Appellees.
J. Elliott Baker, Special Asst. Attorney General, for Intervenor/Appellee, State of Louisiana.
Perret Doise, by Nadia de la Houssaye, for Louisiana Patient's Comp Fund.
Rankin, Yeldell & Katz, by Stephen J. Katz, for Dr. John Ziegler.
Before BROWN, STEWART, CARAWAY, & PEATROSS & DREW, JJ.
*1089 PEATROSS, J.
After a jury trial in this medical malpractice case, the jury returned a unanimous verdict in favor of Plaintiffs, Jonathon and Belinda Johnson, and against Defendant, Morehouse General Hospital, finding that Defendant committed four acts of medical malpractice which caused injury and damage to Plaintiffs' minor child, Garrett Johnson. The jury further found that Dr. John Ziegler, another Defendant who had previously been dismissed from the suit, had committed one act of medical malpractice which caused injury to Plaintiffs. The jury awarded damages to Plaintiffs in the sum of $4,379,946.10.
The trial judge signed a judgment reducing the award in favor of Plaintiffs to $643,946.10, with legal interest thereon. The trial judge further adjudicated the minor child, Garrett, to be a patient in need of continuing medical care pursuant to the provisions of the Louisiana Medical Malpractice Act ("LMMA"). Defendant filed a motion for new trial, which was denied by the trial judge. Both parties now appeal. For the following reasons, we affirm in part, amend in part and affirm as amended.

FACTS
On November 1, 1999, Mrs. Johnson, an insulin-dependent diabetic who was 36½ weeks pregnant at the time, realized that she had not felt fetal movement for two days, so she made an appointment with her obstetrician, Dr. Ziegler. According to the medical expert testimony at trial, insulin-dependent diabetics are considered to have high risk pregnancies because there is often a delay in the lung maturity of the fetus. This presents the risk that the baby, if delivered too soon, may be born before his lungs have fully matured and will not be able to breathe unassisted by a ventilator.
On the other hand, if the baby is delivered too late, there is a risk that the baby will be subjected to intrauterine distress, which can lead to serious complications such as injuries to the heart, lungs, brain and nervous system. Consequently, in high risk pregnancies involving diabetic mothers, a cesarean section is often performed shortly after the child's lungs are proven to have matured.
On the day of Mrs. Johnson's appointment, Dr. Ziegler ordered the scheduling of an amniocentesis, a procedure where amniotic fluid is withdrawn from the uterus, to determine whether the baby's lungs had matured sufficiently for delivery. The amniocentesis was subsequently performed on November 2, 1999, through outpatient services. Dr. Ziegler also ordered an amniostat, a laboratory study analyzing the amniotic fluid obtained during the amniocentesis, to be performed at Morehouse General Hospital. He then ordered that the fluid be sent for testing in two additional laboratory studies, a phosphatidyl glycerol ("PG") and an lecithin/sphingomyelin ratio ("L/S ratio"), the results of which would be sent to a reference lab for analysis. Dr. Ziegler ordered the results of all three studies to be phoned to him as soon as they were available.
The fluid from the amniocentesis was analyzed for the amniostat at Morehouse General Hospital with the results indicating that the baby's lungs had matured. The fluid was then sent to the outside reference lab for the PG and L/S ratio, with results also indicating lung maturity. The results were transmitted back to Morehouse General Hospital on the following day, November 3, 1999, at 3:28 p.m. According to the medical expert testimony at trial, an L/S ratio is an important test regarding the health of a fetus, the results *1090 of which should ideally be communicated to the physician within one hour of receipt or sooner if possible.
Around 8:00 p.m. on November 3, 1999, Mrs. Johnson was admitted to Morehouse General Hospital and remained in its obstetrical unit for approximately two hours. During that time, however, Dr. Ziegler still had not received the laboratory test results, nor had he inquired as to their status. Dr. Ziegler chose not to perform the cesarean section at that time; and, since the fetal heart monitor strip did not show any abnormalities requiring immediate cesarean section, Mrs. Johnson was stabilized and sent home.
Then on November 4, 1999, at approximately 9:00 a.m., Dr. Ziegler received the laboratory test results and his office scheduled an appointment with Mrs. Johnson to take place shortly after the noon hour that day. According to Dr. Ziegler, during her appointment at his office, Mrs. Johnson's biophysical profile and fetal heart monitor indicated that the baby was in a healthy state with no indication of distress.
Dr. Ziegler testified that, even after he had received the laboratory results indicating lung maturity of the fetus, he chose not to perform the cesarean section immediately. He explained that he wanted to wait to perform the cesarean section because the baby was stabilized at that time, Mrs. Johnson had just eaten lunch, he knew of no available operating rooms in the hospital where he could perform the surgery and the pediatrician, Dr. John Coats, would not be available to care for the baby post-cesarean until later in the day. As a result, Dr. Ziegler scheduled a cesarean section for five hours later at 6:00 p.m.
Around 3:30 p.m. that afternoon, Mrs. Johnson was readmitted to Morehouse General Hospital, taken to the obstetrical unit and placed on a fetal heart monitor. Beginning at approximately 3:47 p.m., the fetal heart monitor began to indicate signs of severe intrauterine distress. There were several different nurses who entered and left Mrs. Johnson's room during and after this time. According to the testimony at trial, Dr. Ziegler was not initially aware of the abnormalities indicated on the fetal heart monitor and did not go to Mrs. Johnson's room. Instead, he finished seeing his clinic patients for the day and then went to check on Mrs. Johnson a little after 5:00 p.m.
After arriving at Mrs. Johnson's hospital room, Dr. Ziegler and Mrs. Johnson began to discuss the tubal ligation procedure which was to be performed after the cesarean section. Soon thereafter, Mrs. Johnson signed the applicable consent forms for the cesarean section and the tubal ligation procedures. Then, at approximately 5:35 p.m., Dr. Ziegler was notified by one of the nurses in the room that the fetal heart monitor strip indicated signs of severe fetal stress. About fifteen minutes later at 5:50 p.m., initial surgery preparations were made by Dr. Ziegler, Dr. Coats and hospital personnel and an emergency cesarean section was performed around 6:00 p.m. Subsequently, Mrs. Johnson's baby, Garrett, was born with brain damage and cerebral palsy.
The case was submitted to a Medical Review Panel which returned an opinion that was favorable to both Dr. Ziegler and Morehouse General Hospital. Shortly thereafter, the current suit was filed. As previously stated, the jury returned a verdict in favor of Plaintiffs, finding four acts of medical malpractice on the part of Morehouse General Hospital, and awarded damages in the amount of $4,379,946.10. In accordance with applicable statutory medical malpractice damages caps, the trial judge reduced the damages to $643,946.10, with legal interest thereon, *1091 and further found the child to be a patient in need of continuing medical care pursuant to the LMMA. After Defendant's motion for new trial was denied, this appeal ensued with both parties urging assignments of error.

DISCUSSION
On review, an appellate court may not set aside the findings of the trier of fact unless those findings are clearly wrong or manifestly erroneous. Smith v. Louisiana Dept. of Corrections, 93-1305 (La.2/28/94), 633 So.2d 129; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). An appellate court must not base its determination on whether it considers the trier of fact's conclusion to be right or wrong, but on whether the fact finder's conclusion was reasonable. Stobart, supra.
In order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. Salvant v. State, 05-2126 (La.7/6/06), 935 So.2d 646; Stobart, supra. The appellate court must not reweigh the evidence or substitute its own factual findings because it would have decided the case differently. Pinsonneault v. Merchants & Farmers Bank & Trust Co., 01-2217 (La.4/3/02), 816 So.2d 270.
Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong, even if the reviewing court would have decided the case differently. Id. Causation is a factual finding which should not be reversed on appeal absent manifest error. Detraz v. Lee, 05-1263 (La.1/17/07), 950 So.2d 557; Martin v. East Jefferson General Hosp., 582 So.2d 1272 (La.1991); Smith v. State through Dept. of Health and Human Resources Admin., 523 So.2d 815 (La.1988).
Defendant asserts in assignment of error number four that the jury's verdict was manifestly erroneous, inconsistent with the facts and applicable law and improperly founded upon sympathy. According to the jury verdict form, the jury found that Defendant was negligent in committing four separate acts of medical malpractice, all of which caused loss, injury or damages to Plaintiffs.
The specific acts of negligence alleged were as follows: (1) Defendant failed to notify Dr. Ziegler of the laboratory results indicating lung maturity when they were received on November 3, 1999, at 3:28 p.m.; (2) Defendant failed to notify Dr. Ziegler of the laboratory test results when he was evaluating Mrs. Johnson in Morehouse General Hospital later in the evening of November 3, 1999; (3) Defendant failed to notify Dr. Ziegler of the laboratory test results prior to 9:00 a.m. on the morning of November 4, 1999; and (4) Defendant failed to report the abnormalities on the fetal heart tracings to Dr. Ziegler on November 4, 1999.
The jury further found that Dr. Ziegler was negligent in his treatment of Mrs. Johnson, but also determined, however, that this negligence was not a superseding cause of Garrett's injuries. The jury apportioned 80% of the total fault to Defendant for its negligence and 20% of the total fault to Dr. Ziegler for his negligence.
In a medical malpractice case, the plaintiff has the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the *1092 state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
See La. R.S. 9:2794(A); Salvant, supra; Pfiffner v. Correa, 94-0924 (La.10/17/94), 643 So.2d 1228.

Failure to Report Laboratory Test Results
Our review of the record in the case sub judice indicates that the jury erred in its finding that Defendant was negligent due to its failure to report the laboratory test results to Dr. Ziegler on Defendant's initial receipt at 3:28 p.m. on November 3, 1999, later in the evening of November 3, 1999, and in the morning of November 4, 1999, prior to 9:00 a.m. In the event Defendant breached an applicable standard of care in its delayed delivery of the laboratory test results to Dr. Ziegler, this breach did not cause the loss, injuries or damages sustained by Plaintiffs.[1]
As previously stated, Dr. Ziegler received the laboratory test results indicating lung maturity of the fetus around 9:00 a.m. on the morning of November 4, 1999. According to the medical expert testimony of Dr. Aristoteles Pena-Miches, Dr. Robert Katz and Dr. Ziegler himself, insulin-dependent diabetic mothers have extremely high risk pregnancies due to the likelihood of potential complications that can arise causing injury to the fetus. All three experts agreed that obstetricians have a short window of time during these types of pregnancies to deliver the baby safely after the test results prove lung maturity. If the baby is not delivered quickly enough after the lungs have matured, risks of intrauterine distress arise, such as damage to the lungs, heart, brain and nervous system.
Dr. Ziegler was well aware of the risks associated with Mrs. Johnson's pregnancy as an insulin-dependent diabetic. He testified that, when he saw Mrs. Johnson for her appointment at his office three hours after receiving the laboratory test results, her biophysical profile and fetal heart monitor tracings both indicated that the baby was in good, stable health and not in distress. The baby's healthy state at that time, three hours after Defendant's delayed reporting of the laboratory results, indicates that Defendant's failure to notify Dr. Ziegler of the results on any of the three occasions prior to November 4, 1999, at 9:00 a.m., even if considered to be an unreasonably delayed reporting, was not a cause of the loss, damages or injuries sustained by Plaintiffs.

Negligence of Dr. Ziegler
Additionally, once Dr. Ziegler was made aware of the laboratory results, he could have scheduled a cesarean section *1093 almost immediately, but chose not to do so until approximately nine hours after receiving the laboratory results. Dr. Ziegler testified that he waited to schedule the surgery for several reasons, including the lack of an available operating room, the lack of availability of Dr. Coats, because Mrs. Johnson had recently eaten lunch and he knew that the baby was stabilized at the time and not in need of an emergency cesarean section.
According to the testimony of Dr. Jason Wilson, if Dr. Ziegler had decided to perform a cesarean section earlier in the day, an operating room would have been made available for his use, as is customary in most hospitals. Dr. Wilson also testified that he noticed many opportunities to deliver Garrett safely prior to the cesarean section scheduled on November 4, 1999, at 6:00 p.m. He further stated that, while he believed that Dr. Ziegler was very well intentioned and intelligent, he appeared to have simply forgotten about the laboratory test results.
Dr. Coats testified that he would never have told the obstetrician that he was not available for a cesarean section. He further stated that, had he been notified that he was needed for Garrett's delivery at any point earlier in the day, he would have come over immediately and his office patients would have been required to wait until he returned.
Given the testimony of the aforementioned medical experts and Dr. Ziegler's own testimony that he knew of the high risk of complications associated with Mrs. Johnson's pregnancy, we agree with the jury's finding that Dr. Ziegler was negligent in his treatment of Mrs. Johnson. We disagree with the jury's conclusion, however, that Dr. Ziegler's negligence was not a superseding cause of Garrett's injuries. Dr. Ziegler had the option to deliver the child safely at any point between 9:00 a.m. and 3:00 p.m. on November 4, 1999, but chose not to, citing reasons which were discredited by the testimony of Dr. Wilson and Dr. Coats.

Failure to Report Fetal Heart Monitor Irregularities
Finally, we find no manifest error in the jury's finding that Defendant was negligent due in its failure to report the abnormalities on the fetal heart tracings to Dr. Ziegler which began at approximately 3:47 p.m. on November 4, 1999, and lasted for over an hour prior to Dr. Ziegler's arrival at Mrs. Johnson's room. According to the testimony of nurse Gwen Stephenson, on noticing abnormalities in the fetal heart monitor tracings, she did not leave the room to tell Dr. Ziegler because she did not want to leave Mrs. Johnson unattended. Once Dr. Ziegler arrived, she simply held the fetal heart monitor strip up in a way that she thought would make him aware of the irregularities.
Nurse Stephenson admitted that she never verbally informed Dr. Ziegler of the abnormalities because she did not want to say anything alarming in front of Mrs. Johnson. Once Nurse Stephenson believed she had sufficiently indicated to Dr. Ziegler that the fetal heart tracings were irregular, she just waited until her shift was over at 5:00 p.m., then asked Dr. Ziegler if he needed anything else before she left and went home for the night.
After Nurse Stephenson left for the night, Mrs. Johnson remained in her room with Dr. Ziegler until Nurse Lori Priestly, whose shift had just begun, arrived at about 5:30 p.m. Nurse Priestly testified that she noticed within a few minutes that the fetal heart tracings were irregular and she informed Dr. Ziegler, who stated that he had no knowledge of the irregularities prior to that time.
*1094 According to Nancy Cook, a scrub technician at Morehouse General Hospital, there were several nurses in and around Mrs. Johnson's room prior to Dr. Ziegler's arrival after 5:00 p.m. The cumulative testimony of all hospital personnel, however, reveals that, in spite of the presence of several hospital staff who could have informed Dr. Ziegler of the fetal heart monitor tracing irregularities, Dr. Ziegler remained uninformed of such until shortly after 5:30 p.m. For this reason, we find no manifest error in the jury's finding that Defendant was negligent in its failure to promptly notify Dr. Ziegler of the abnormalities on the fetal heart monitor tracings. Additionally, we agree that this negligence act on the part of Defendant contributed to the loss, injury or damages sustained by Plaintiffs.

Apportionment of Fault
The Louisiana Supreme Court summarized in Hebert v. Rapides Parish Police Jury, 06-2001 (La.4/11/07), 974 So.2d 635, the standard for reviewing allocation of fault determinations:
Finding the same considerations applicable to the fault allocation process as are applied in quantum assessments, "the trier of fact is owed some deference in allocating fault" since the finding of percentages of fault is also a factual determination. Clement v. Frey, 95-1119 (La.1/16/96), 666 So.2d 607. As with other factual determinations, the trier of fact is vested with much discretion in its allocation of fault. Id. Therefore, an appellate court should only disturb the trier of fact's allocation of fault when it is clearly wrong or manifestly erroneous. Only after making a determination that the trier of fact's apportionment of fault is clearly wrong can an appellate court disturb the award, and then only to the extent of lowering it or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion. Clement, supra; Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).
Considering our discussion herein regarding the acts of negligence committed by Dr. Ziegler and Defendant, we find that the jury manifestly erred in its apportionment of fault. Accordingly, finding such to be the lowest reasonable allocation, we apportion 80% of the total fault to Dr. Ziegler. Additionally, finding such to be the highest reasonable allocation, we apportion 20% of the total fault to Defendant.
Further, we see no manifest error in the jury's determination that Garrett is a patient in need of continuing medical care for the brain damage and medical problems he sustained at birth. The child's medical records in conjunction with the medical expert testimony elicited at trial adequately support this finding.
Although we have reapportioned the percentages of fault, we note that this will have no ultimate effect on the jury's award of damages, the amount of which was properly reduced by the trial judge in accordance with La. R.S. 40:1299.42, as reflected in his January 13, 2007 judgment. In any event, Defendant did not appeal the jury's award of damages.

Expert Witnesses
Defendant asserts in assignment of error number one that the trial judge improperly overruled its objection to Plaintiffs' expert witness, Dr. William Kendrick Hardin, based on his lack of qualifications pursuant to La. R.S. 9:2794. We agree.
The trial court is granted broad discretion in its evidentiary rulings, which will not be disturbed on appeal absent a clear abuse of that discretion. Crisler v. Paige One, Inc., 42,563 (La.App.2d Cir.1/9/08), 974 So.2d 125; Graves v. Riverwood Intern. *1095 Corp., 41,810 (La.App.2d Cir.1/31/07), 949 So.2d 576, writ denied, 07-0630 (La.5/4/07), 956 So.2d 621, citing Roberts v. Owens-Corning Fiberglas Corp., 03-0248 (La.App. 1st Cir.4/2/04), 878 So.2d 631, writ denied, 04-1834 (La.12/17/04), 888 So.2d 863; Emery v. Owens-Corporation, 00-2144 (La.App. 1st Cir.11/9/01), 813 So.2d 441, writ denied, 02-0635 (La.5/10/02), 815 So.2d 842.
At trial, a party must make a timely objection to evidence that the party considers to be inadmissible and must state the specific ground for the objection. La. C.E. art. 103(A)(1); La. C.C.P. art. 1635; Crisler, supra; Graves, supra; McWilliams v. Courtney, 41,725 (La.App.2d Cir.12/13/06), 945 So.2d 242. On appeal, this court must consider whether the complained-of ruling was erroneous and whether the error affected a substantial right of the party affected. Crisler, supra; Graves, supra. If not, a reversal is not warranted. Crisler, supra; Graves, supra, citing La. C.E. art. 103(A); Emery, supra; Brown v. Associated Insurance Consultants, Inc., 95-1451 (La.App. 1st Cir.4/4/96), 672 So.2d 324, writ denied, 96-1106 (La.6/7/96), 674 So.2d 970. The determination is whether the error, when compared to the record in its totality, has a substantial effect on the outcome of the case; and it is the complainant's burden to so prove. Crisler, supra; Graves, supra.
La. R.S. 9:2794 D provides in pertinent part:
D. (1) In a medical malpractice action against a physician, licensed to practice medicine by the Louisiana State Board of Medical Examiners under R.S. 37:1261 et seq., for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who meets all of the following criteria:
(a) He is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose.
(b) He has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim.
(c) He is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of care.
(d) He is licensed to practice medicine by the Louisiana State Board of Medical Examiners under R.S. 37:1261 et seq., is licensed to practice medicine by any other jurisdiction in the United States, or is a graduate of a medical school accredited by the American Medical Association's Liaison Committee on Medical Education or the American Osteopathic Association.
(2) For the purposes of this Subsection, "practicing medicine" or "medical practice" includes but is not limited to training residents or students at an accredited school of medicine or osteopathy or serving as a consulting physician to other physicians who provide direct patient care, upon the request of such other physicians.
According to Dr. Hardin's own testimony at trial, he was not practicing medicine in 1999 at the time of the incident involving Garrett and he was not practicing medicine in 2007 when he testified at trial. In addition, Dr. Hardin was not training residents or students at an accredited medical school and he was not serving as a consulting physician during either of the relevant time periods.
*1096 La. R.S. 9:2794 D(1) is explicitly clear in that it requires an expert to meet all of the criteria set forth in paragraphs (a) through (d) of La. R.S. 9:2792 D(1). Since Dr. Hardin clearly failed to meet the criteria set forth in paragraph (a) of La. R.S. 9:2994 D, the trial judge erred when he failed to disqualify Dr. Hardin as a medical expert and exclude his testimony at trial.
When compared to the record in its totality, however, the trial judge's improper admission into evidence of Dr. Hardin's testimony does not appear to have had a substantial effect on the outcome of the case. Dr. Hardin was only one of six physicians who testified as a medical expert at trial; and, in the context of the entire record, his testimony was relatively brief. Furthermore, considering the testimony of the other medical experts, the arguments of counsel and the totality of the evidence presented at trial, the jury would likely have reached the same verdict had his testimony been excluded from trial.
Accordingly, we find that the trial judge's admission into evidence of Dr. Hardin's testimony was harmless error. Crisler, supra; Graves, supra.

Closing Argument
Defendant asserts in assignment of error number two that, during closing arguments, counsel for Plaintiffs wrongfully indicated to the jury that Morehouse General Hospital was the only Defendant in this case from which Plaintiffs could receive a money judgment. Defendant objected in a timely fashion between arguments to avoid drawing more attention to the error and requested that the trial court give an admonition to the jury to disregard the statement. Defendant argues that the trial court erroneously declined to make the admonition, citing for its reasons that the "bell had been rung."
Similarly, in assignment of error number three, Defendant asserts that the trial court erroneously overruled its objection to Plaintiffs' counsel's remarks during closing argument that Defendant had submitted an incomplete copy of the fetal heart monitor strips to Plaintiffs in an effort to "hide something." Defendant contends, however, that it offered, filed and introduced into evidence an original, complete, certified copy of the 119 pages of the relevant fetal heart monitor strips and complains that it was unreasonable and unfair for Plaintiffs to submit an incomplete set of records, purporting to be the fetal heart monitor strips submitted by Defendant, and then claim it was Defendant who had submitted the incomplete set. According to Defendant, this action by Plaintiffs prejudiced the jury against it and caused them to "think less" of Defendant. Defendant contemporaneously objected to Plaintiffs' counsel's remarks during closing arguments regarding the fetal heart monitor strips.
The court has the power to require that the proceedings are conducted with dignity and in an orderly and expeditious manner and to control the proceedings at trial so that justice is done. La. C.C.P. art. 1631. An attorney at law is an officer of the court and shall conduct himself at all times with decorum and in a manner consistent with the dignity and authority of the court. La. C.C.P. art. 371. He shall treat the court, jurors, witnesses, opposing party and opposing counsel with due respect. Id. He shall not interfere with or impede the orderly dispatch of judicial business by the court. Id. He shall not knowingly encourage or produce false evidence or make any misrepresentation, impose upon or deceive the court. Id.
All parties are entitled to a fair trial on the merits of the case, uninfluenced by appeals to passion and prejudice. *1097 Ogletree v. Willis-Knighton Memorial Hospital, Inc., 530 So.2d 1175 (La.App. 2d Cir.1988), writ denied, 532 So.2d 133 (La. 1988); Cooper v. United Southern Assurance Co., 97-0250 (La.App. 1st Cir.9/9/98), 718 So.2d 1029. Counsel should confine their arguments to the evidence admitted and the inferences that may be properly drawn from it. Ogletree, supra; Cooper, supra. The test of whether an argument of counsel is prejudicial or inflammatory is whether such comment is unreasonable or unfair in the eyes of the law. Temple v. Liberty Mut. Ins. Co., 330 So.2d 891 (La. 1976); Ogletree, supra; Terrance v. Dow Chemical Co., 06-2234 (La.App. 1st Cir.9/14/07), 971 So.2d 1058, writ denied, 07-2042 (La.12/14/07), 970 So.2d 534; Cooper, supra.
When the language used is such as discloses a studied purpose to arouse the prejudices of the jury, the court cannot overlook it or consider that a party against whom such effort has been made has had a fair consideration of its case at the hands of the jury. Temple, supra; Ogletree, supra. It is equally well settled that counsel has great latitude in argument before a jury and fair advocacy not designed to inflame the jury is permissible. Temple, supra; Ogletree, supra; Terrance, supra; Cooper, supra.
In the case sub judice, Plaintiffs' counsel's objectionable statements concerning the sole source of Plaintiffs' damages and the purported incomplete set of fetal heart monitor strips were subject to corrective measures. The court admonished the jury, both at the start of the trial and when all parties had rested, that the statements of counsel were their opinions and nothing more. The court stated that these statements were designed to persuade and direct the jury toward a particular verdict, were not to be considered evidence and should not interfere with its determination of the facts. While we express great concern over the tactics of Plaintiffs' counsel during his closing argument, we find that these statements by the trial court at the beginning and end of the trial served to counteract the possibly adverse effect of Plaintiffs' counsel's arguments. Temple, supra.
Accordingly, we find Defendant's second and third assignments of error to be without merit.

Expert Witness Fees
In assignment of error number five, Defendant argues that the trial court erroneously disregarded the provisions set forth in La. R.S. 13:3666(B) by improperly adopting the expert witness fees in the amounts claimed by the expert witnesses. Defendant contends that the trial court should have taken testimony evidencing the proper amount of the fees or should have issued a rule to show cause in accordance with the statute. Defendant further claims that the expert witness fees awarded to Plaintiffs were punitive in nature.
La. R.S. 13:3666(B) provides:
B. The court shall determine the amount of the fees of said expert witnesses which are to be taxed as costs to be paid by the party cast in judgment either:
(1) From the testimony of the expert relative to his time rendered and the cost of his services adduced upon the trial of the cause, outside the presence of the jury, the court shall determine the amount thereof and include same.
(2) By rule to show cause brought by the party in whose favor a judgment is rendered against the party cast in judgment for the purpose of determining the amount of the expert fees to be paid by the party cast in judgment, which rule upon being made absolute *1098 by the trial court shall form a part of the final judgment in the cause.
Witnesses called to testify as expert witnesses shall be compensated for their services, with the amount to be determined by the court and taxed as costs to be paid by the party cast in judgment. La. R.S. 13:3666; Mount Mariah Baptist Church, Inc. v. Pannell's Associated Electric, Inc., 36,361 (La.App.2d Cir.12/20/02), 835 So.2d 880, writ denied, 03-0555 (La.5/2/03), 842 So.2d 1101. An expert witness is entitled to reasonable compensation for his court appearance and for his preparatory work. Orea v. Scallan, 32,622 (La.App.2d Cir.1/26/00), 750 So.2d 483. The trial judge has great discretion in awarding and fixing costs and expert fees. Mount Mariah Baptist Church, Inc., supra. A trial court's assessment of costs can be reversed by an appellate court only upon a showing of abuse of discretion. Mount Mariah Baptist Church, Inc., supra; Orea, supra.
Factors to be considered by the trial judge in setting expert witness fees include time spent testifying, time spent in preparatory work for trial, time spent away from regular duties while waiting to testify, the extent and nature of the work performed and the knowledge, attainments and skill of the expert. Mount Mariah Baptist Church, Inc., supra. Additional considerations include the helpfulness of the expert's report and testimony to the court, the amount in controversy, the complexity of the problem addressed by the expert and awards to experts in similar cases. Id.
Considering our discussion of Defendant's first assignment of error wherein we found that the trial judge erred in admitting the testimony of Dr. Hardin on the grounds that he did not qualify as a medical expert under La. R.S. 9:2794, we reduce the total award of expert witness fees by the amount of Dr. Hardin's fee, i.e., $3,700. With regard to the award of expert witness fees for the services of Dr. Pena-Miches and Dr. Katz, we do not find the amounts of those fees to be excessive, unreasonable or punitive. Consequently, we find no abuse of discretion on the part of the trial judge in awarding those fees. We, therefore, reduce the trial judge's total award of expert witness fees in favor of Plaintiffs from $11,600 to $7,900.

Motion for New Trial
In its sixth and final assignment of error, Defendant asserts that the trial judge erroneously denied, but had "good grounds" to grant, its motion for new trial, specifically because the jury returned a verdict based on the testimony of a witness who was not credible, i.e., Dr. Ziegler.
A new trial may be granted in any case if there are good grounds therefor. La. C.C.P. art.1974; Horton v. Mayeaux, 05-1704 (La.5/30/06), 931 So.2d 338. Whether to grant a new trial requires a discretionary balancing of many factors. Dowles v. Conagra, Inc., 43,074 (La.App.2d Cir.3/26/08), 980 So.2d 180; Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La.App. 2d Cir.1991). The trial judge may evaluate evidence without favoring any party and draw his own inferences and conclusions. Dowles, supra.
Perhaps the significant authority is the trial judge's ability to assess the credibility of witnesses when determining whether to grant or deny the motion for new trial. Dowles, supra; Morehead v. Ford Motor Co., 29,399 (La.App.2d Cir.5/21/97), 694 So.2d 650, writ denied, 97-1865 (La.11/7/97), 703 So.2d 1265. The trial judge's discretion in ruling on a motion for new trial is great and his decision will not be disturbed on appeal absent an *1099 abuse of that discretion. Dowles, supra; Morehead, supra. Furthermore, "when the trial judge is convinced by his examination of the facts that the judgment would result in a miscarriage of justice, a new trial should be ordered." Lamb v. Lamb, 430 So.2d 51 (La.1983); Dowles, supra.
The fact that a determination on a motion for new trial involves judicial discretion, however, does not imply that the trial court can freely interfere with any verdict with which it disagrees. Dowles, supra. The discretionary power to grant a new trial must be exercised with considerable caution, for a successful litigant is entitled to the benefits of a favorable jury verdict. Id. Fact finding is the province of the jury and the trial court must not overstep its duty in overseeing the administration of justice and unnecessarily usurp the jury's responsibility. Id.
A motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury's factual determinations and must be viewed in that light. Dowles, supra. Thus, the jury's verdict should not be set aside if it is supportable by any fair interpretation of the evidence. Gibson, supra.
After thorough review of the record, we cannot say that the trial judge committed manifest error or abused his discretion in denying Defendant's motion for new trial. Dr. Ziegler was only one of many witnesses who testified over the course of a week long trial. Given the totality of the evidence submitted in this case, we are not inclined to believe that his testimony, regardless of its credibility, was the sole consideration of the jury in reaching a verdict. We find this assignment of error to be without merit.

ANSWER TO APPEAL
Plaintiffs contend that the trial judge erred in declining to sign their proposed judgment allowing a separate award of damages, each with its own cap for each separate act of negligence of Defendant, and, consequently, in failing to sign a judgment which conformed to the jury verdict.
In consideration of our discussion of Defendant's fourth assignment of error wherein we determined that Defendant only committed one distinct act of negligence, i.e., in failing to promptly notify Dr. Ziegler of the irregularities on the fetal heart monitor tracings, we pretermit any discussion of the issue of damages for the other three purported acts of negligence urged by Plaintiffs. This assignment of error is, therefore, without merit.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed in part, amended in part and affirmed as amended. Costs of this appeal are assessed equally to both parties.
AFFIRMED IN PART, AMENDED IN PART and AFFIRMED AS AMENDED.
BROWN, C.J., dissents in part with written reasons.
BROWN, Chief Judge, dissenting in part,
I agree that Dr. Ziegler was negligent in delaying the delivery of the child after he received the laboratory results at 9:00 a.m. on November 4; however, a successful delivery may still have been possible, or at least the damage lessened, if the delivery had been immediately performed when the abnormalities on the fetal heart tracings first appeared. This child was under distress from 3:30 p.m. until 5:00 p.m. before it was reported to Dr. Ziegler.
*1100 I disagree with the majority view that Dr. Ziegler's negligence was a "superseding cause" of the child's injuries. A "superseding cause" is a subsequent act of negligence by another person or entity which supersedes the negligent act of the first person. See Adams v. Rhodia, Inc., 07-2110 (La.05/21/08), 983 So.2d 798.
In this case, the act of the nurse in not immediately informing Dr. Ziegler of the stress shown on the monitoring strips was the last negligent act and thus, could be claimed to be a "superseding cause" of the child's injuries. Because Dr. Ziegler's negligence had not ended, however, I would not label the nurse's failure to inform Dr. Ziegler as a superseding cause. I would note that the viability of the concept of superseding negligence relieving the first actor of any liability is itself questionable in a comparative fault system.
It was for the jury to apportion fault. I believe the majority has substituted its opinion for that of the jury and would affirm the jury's reasonable apportionment of fault. Frankly, the defendant's witnesses were impeached while the jury found Dr. Ziegler credible. As to Dr. Ziegler's settlement, it was defendant's attorney who first brought this issue into the case.
Although the majority's reapportionment of fault will not reduce defendant's payment of the damage award, it will affect the continuing medical care obligation. Thus, I would affirm the jury's apportionment of fault.
APPLICATION FOR REHEARING
Before BROWN, STEWART, CARAWAY, & PEATROSS & DREW, JJ.
Rehearing denied.
NOTES
[1] During oral argument before this court, counsel for Plaintiffs conceded to this fact.