VICTORY, J.*
|, In this medical malpractice case, the jury found Morehouse General Hospital (“Morehouse”) committed four acts of malpractice that caused injury to an infant, Garrett Johnson, and found Dr. John Ziegler was negligent in his care of the infant’s mother, Belinda Johnson. The jury apportioned 80% of the fault to Morehouse and 20% of the fault to Dr. Ziegler. The court of appeal found the jury was manifestly erroneous in finding Morehouse liable for three of the four acts of negligence, and held that Morehouse was 20% at fault and Dr. Ziegler was 80% at fault. We granted a writ application to consider whether the court of appeal properly modified the jury verdict. After considering the record and the law, we find that the court of appeal was correct in finding that Morehouse was only liable for one act of negligence; however, we disagree with its apportionment of fault and find Morehouse and Ziegler each to be 50% at fault.
I ¡¿FACTS AND PROCEDURAL HISTORY
On November 1, 1999, Belinda Johnson (“Johnson”), an insulin-dependent diabetic, was 36½ weeks pregnant. Because pregnancies in insulin-dependent diabetics are considered high-risk, diabetic mothers often have a cesarean section (“C-section”) *91 performed shortly after the baby’s lungs are proven to have matured. When Johnson realized she had not felt fetal movement for two days, she made an appointment with her obstetrician, Dr. Ziegler.[1] Dr. Ziegler performed an amniocentesis at Morehouse on November 2,1999. After the amniocentesis was performed, Dr. Ziegler ordered an amniostat, which is a laboratory study analyzing the amniotic fluid obtained during the amniocentesis. The amniostat tests for phosphatidylglycerol (PG), the presence of which protein could indicate fetal lung maturity. The amnios-tat was performed at Morehouse on November 2, and the results were communicated to Dr. Ziegler that day. The results of the amniostat were negative for PG, indicating that the baby’s lungs had not fully developed. Dr. Ziegler’s orders to hospital staff were if the amniostat was negative, the hospital was to send the fluid off for a lecithin to sphingomyelin ration (“L/S ratio”) test, a more advanced test to determine lung maturity, and for a more sophisticated PG test. His ^orders stated: “Call me when amniotic fluid report is back.” The Morehouse lab sent the amniotic fluid to its reference lab in Texas for the ordered L/S ratio and PG tests. The results of the PG and L/S ratio tests were transmitted back to Morehouse at 8:28 p.m. on the following day, November 3, 1999. The tests reported a low positive of PG and a L/S ratio greater than 2.5 to 1, indicating that the baby’s lungs had matured. These results were not reported to Dr. Ziegler that day.
At approximately 8:00. p.m. that evening, Johnson was admitted to Morehouse with complaints of back pain and pelvic pressure and was placed on a fetal heart monitor, which charted the baby’s heart rate in the 140s to 150s and also noted some long term variability, but no accelerations or decelerations in the baby’s heart rate.[2] When Dr. Ziegler saw Johnson in the hospital that evening, he had not received the results of the PG and L/S ratio tests, nor had he inquired about their status. Since he felt the fetal heart monitor did not show any irregularities requiring an immediate C-section, Dr. Ziegler stabilized Johnson and sent her home at about 10:20 p.m.
Dr. Ziegler received the results from the PG and L/S ratio tests at approximately 9:00 a.m. on November 4, 1999. Johnson was scheduled for an office visit at noon that day, during which time Dr. Ziegler again placed her on a fetal heart monitor and performed a biophysical examination of Johnson and the unborn baby. The *92 biophysical profile rating was a four out of ten. According to testimony, that rating did not indicate the need for an emergent C-section but indicated the need for another biophysical profile in a few hours, and if that later score did not improve, the obstetrician should proceed with a C-section. Dr. Ziegler opined that Johnson’s biophysical profile and fetal heart monitor at the time of her appointment revealed the |4baby was in a healthy state with no indication of distress. Even though Dr. Ziegler had received the test results showing the baby’s lungs had matured, he did not schedule a C-section until 6:00 p.m. on November 4. Dr. Ziegler explained he did not schedule the C-section immediately because the baby was stabilized during the office visit, Johnson had just eaten lunch, there were no operating rooms available at Morehouse to perform the surgery, and Dr. John Coats, IV, a physician scheduled to attend and assist Dr. Ziegler in the delivery, would not be available until later in the day.
At approximately 3:30 p.m. that afternoon, Johnson was admitted to the hospital and prepped for surgery by Nurse Gwen Stephenson. Sometime between her admission and 4:00 p.m., she was placed on the fetal heart monitor. There is conflicting testimony regarding when the fetal heart monitor tracings began to show signs of fetal distress. Dr. Ziegler was not initially notified of any abnormalities that may have appeared on the monitor tracings, and he finished seeing patients at his office before attending to Johnson at the hospital. After arriving at her hospital room, Dr. Ziegler discussed and reviewed the tubal ligation procedure with Johnson, which was to be performed after the C-section. Johnson signed the consent forms for the C-section and the tubal ligation procedures at approximately 5:30 p.m. At 5:34 p.m., Nurse Lori Priestley alerted Dr. Ziegler, who was sitting on the side of Johnson’s hospital bed, of the decrease in the fetal heart rate to the 80s. In an effort to find a stronger heart beat, Dr. Ziegler adjusted the monitor and ordered the administration of Brethine, a drug which slows or stops contractions in an effort to relieve stress on the placenta and, therefore, the baby’s oxygen supply. Dr. Ziegler, along with Dr. Coats, who had arrived to attend the scheduled C-section, and Nurse Priestley, rushed Johnson to the operating room and performed the C-section shortly thereafter, at |fiaround 6:00 p.m. Garrett Johnson was born with no heart beat and no respiration and with only a pulse detected in the umbilical cord. Dr. Coats successfully resuscitated Garrett, who regained his respiratory rate and his heart rate, and, once stabilized, was transferred to the St. Francis Hospital NICU. It was later determined he sustained severe brain damage in útero and suffered the complications of cerebral palsy, caused by hypoxia or lack of oxygen to the brain.
Johnson filed a malpractice complaint with the Louisiana Patients’ Compensation Fund against Dr. Ziegler and Morehouse. She voluntarily dismissed her claim against Dr. Ziegler, however, upon his execution of an affidavit, in which he swore that if he had been made aware of the laboratory results on the evening of November 3, 1999, he would have performed the C-section at that time.[3] As a result, *93 the Medical Review Panel only reviewed the actions of the nurses at Morehouse. The Medical Review Panel, consisting of three obstetricians/gynecologists, unanimously found the evidence did not support the conclusion that Morehouse or its employees failed to meet the applicable standard of care in the treatment of Johnson.
The panel provided three reasons to support its conclusions. First, it found Morehouse promptly performed the amn-iostat and promptly reported the result to Dr. | r,Ziegler. The amniotic fluid was then immediately sent by Morehouse’s laboratory to the outside reference laboratory for the L/S ratio test and the patient was discharged from Morehouse later that day. Second, the panel found Morehouse received the results of the L/S ratio test at 3:28 p.m. on November 3, but Dr. Ziegler was unaware of the test results when Johnson returned to Morehouse that evening at approximately 8:00 p.m. The panel found Morehouse did not have a duty on November 3, to report the laboratory information to Dr. Ziegler since Johnson had been discharged from the hospital on November 2, 1999. Third, the panel found the care of Johnson during her hospitalization at Morehouse was within the standard of care for hospital staff, nurses, and other personnel.
After the Medical Review Panel issued its opinion, Mr. and Mrs. Johnson, individually and on behalf of their minor son, Garrett, filed this suit against Morehouse and Dr. Ziegler on October 27, 2000. On August 8, 2003, Dr. Ziegler filed several exceptions, including res judicata, estoppel, prescription, and prematurity. Dr. Ziegler asserted that as a result of a compromise agreement with the plaintiffs, he had executed an affidavit and the plaintiffs had dismissed all claims against him with prejudice, by a letter dated January 28, 2002, addressed to the Patients’ Compensation Fund. On November 12, 2003, the trial court sustained Dr. Ziegler’s exceptions of res judicata and prescription and dismissed all claims against him with prejudice at the plaintiffs’ cost. The case continued to trial against Morehouse as the only defendant.
On January 13, 2007, approximately six years after suit was filed, there was a trial on the matter, and the jury returned a verdict in favor of plaintiffs, finding More-house committed four acts of malpractice. The jury found the Morehouse nurses’ conduct fell below the standard of care in failing to notify Dr. Ziegler of the 17lab oratory results when they were received at 3:28 p.m. on November 3, 1999, in failing to notify him of the results when he was evaluating Johnson at Morehouse that evening around 8:00 p.m., and in failing to notify him of the results promptly on the morning of November 4. The jury also found the Morehouse nurses’ conduct fell below the standard of care in failing to promptly report irregularities on the fetal heart monitor to Dr. Ziegler on November 4. The jury found each of these acts caused injury, loss, or damage to Garrett.
In addition, the jury found Dr. Ziegler’s conduct fell below the applicable standard of care in his treatment of Johnson and *94 that his actions contributed to the child’s injuries but were not a superceding cause of them. The jury allocated 80% of the fault to Morehouse and 20% of the fault to Dr. Ziegler[4] and awarded damages in the amount of $4,379,946.10. The jury further found the child was a patient in need of continuing medical care for the brain damage and other medical problems that he suffered at birth. On July 23, 2007, the trial judge reduced the damages to $643,946.10 ($500,000.00 for a single cap and $143,946.10 for past medical expenses), with legal interest, to comply with the provisions of the Louisiana Medical Malpractice Act (“LMMA”).[5] The trial judge also found the child was a patient in need of continuing medical care, with such expenses to be paid by the Patients’ Compensation Fund as they are incurred in the future, in accordance with the LMMA. Morehouse filed a motion for new trial, which was denied by the trial judge.
The Second Circuit Court of Appeal held the jury manifestly erred in finding More-house liable for failing to report the laboratory test results to Dr. Ziegler when | sthey received the results at 3:28 p.m. on November 3, 1999, when Johnson was in the hospital later that evening, or promptly the next morning. Johnson v. Morehouse General Hosp., 44,798 (La.App. 2 Cir. 12/22/09), 27 So.3d 1085. Based on Dr. Ziegler’s testimony that when he saw Johnson for her appointment at his office three hours after receiving the laboratory results, her biophysical profile and fetal heart monitor tracings both indicated the baby was in good, stable health, and not in distress, the court of appeal determined the baby was healthy at that time. Accordingly, the court of appeal found that the baby’s healthy state at that time, three hours after Morehouse’s delayed reporting of the laboratory results, indicated that Morehouse’s failure to notify Dr. Ziegler on any of the three occasions prior to 9:00 a.m. on November 4, 1999, even if considered to be an unreasonable delay in reporting, did not cause or contribute to the child’s injuries. Id. at 1092. However, the court of appeal found no manifest error in the jury’s finding that Morehouse was negligent for failing to report the irregularities on the fetal heart monitor to Dr. Ziegler at 3:47 p.m. on November 4, which continued for almost an hour and a half before he was notified.
The court of appeal also agreed with the jury’s finding that Dr. Ziegler was negligent in his treatment of Johnson. The court of appeal found that once Dr. Ziegler was made aware of the laboratory results at 9:00 a.m. on November 4, 1999, he could have scheduled a C-section immediately, but he chose not to schedule it until approximately nine hours later. Dr. Ziegler gave several reasons for delaying the C-section, but the court of appeal found his reasons were discredited by the testimony of several witnesses.
Relying upon expert medical testimony and Dr. Ziegler’s own testimony that he knew about the high risk of complications associated with Johnson’s pregnancy, [ flthe court of appeal agreed with the jury’s finding that Dr. Ziegler was negligent in his treatment of Johnson. However, the court of appeal disagreed with the jury’s finding that Dr. Ziegler’s negligence was not a *95 superceding cause of the child’s injuries. Because Dr. Ziegler could have delivered the baby safely at any time between 9:00 а.m. and 3:00 p.m. on November 4, 1999, and chose not to for reasons that were discredited at trial, the court of appeal found that Dr. Ziegler’s negligence was a superceding cause of the child’s injuries.
After finding Morehouse only committed one act of malpractice and finding Dr. Ziegler’s negligence was a superceding cause of the child’s injuries, the court of appeal reapportioned fault between More-house and Dr. Ziegler. The court of appeal allocated 20% of the fault to More-house and 80% of the fault to Dr. Ziegler and found no manifest error in the jury’s finding that the child was a patient in need of continuing medical care. The court of appeal also found the trial judge erred in failing to disqualify Dr. William K Hardin, Sr., from testifying as a medical expert, in accordance with La. R.S. 9:2794(D), because he was not practicing medicine at the time of the incident in 1999 or of the trial in 2007. However, given the totality of the evidence, the court of appeal found Dr. Hardin’s testimony did not appear to have a substantial effect on the outcome of the case, and therefore, allowing him to testify was harmless error.[6]
Both parties filed writ applications with this Court. Morehouse asserts that the record did not support the court of appeal’s findings that the fetal heart monitor began |into show signs of severe intrauterine distress at 3:47 p.m. on November 4, and that Morehouse’s delay in notifying Dr. Ziegler of the readings caused Garrett’s injuries. Morehouse also argues that the court of appeal erred in finding the improper admission of Dr. Hardin’s testimony was harmless error, asserting he was the only expert who testified that the fetal distress began before 5:00 p.m. and both the jury and the court of appeal adopted his opinion as fact. Finally, Morehouse alleges that the prejudicial statements made by plaintiffs’ counsel during opening and closing arguments tainted the jury verdict.
The Johnsons argue that the court of appeal erred in reversing the jury’s findings that the failures of Morehouse to notify Dr. Ziegler of the L/S ratio and PG test results was a breach of the standard of care and caused damage to the child and that the negligence of Dr. Ziegler was not a superceding cause. They also urge that the courts of appeal erred in substituting its own judgment in connection with the allocation of fault and in reassessing fault 80% to Dr. Ziegler and 20% to Morehouse. The Johnsons also allege that the court of appeal misinterpreted and erroneously applied La. R.S. 9:2794(D) to Dr. Hardin and that he was qualified to testify as an expert in this case. The two writs were granted and consolidated. Johnson v. Morehouse General Hosp., 10-0387 c/w 10-0488 (La.5/7/10), 34 So.3d 852, 853.[7]
DISCUSSION
When a medical malpractice action is brought against a physician, the *96 plaintiff must establish the standard of care applicable to the physician, a violation of that standard of care by the physician, and a causal connection between the physi-dan’s |nalleged negligence and the plaintiffs resulting injuries. See La. R.S. 9:2794(A);[8] Schultz v. Guoth, 10-0343 (La.1/19/11), 57 So.3d 1002; Pfiffner v. Correa, 94-0924 (La.10/17/94), 643 So.2d 1228, 1233. It is also well-settled that nurses who perform medical services are subject to the same standards of care and liability as are physicians. Cangelosi v. Our Lady of the Lake Regional Medical Center, 564 So.2d 654, 661 (La.1989). Thus, in a medical malpractice action against a hospital, the plaintiff must prove that the hospital caused the injury when it breached its duty. Id. Expert testimony is generally required, except where the negligence is so obvious that a lay person can infer negligence without the guidance of expert testimony. Schultz, supra; Samaha v. Rau, 07-1726 (La.2/26/08), 977 So.2d 880, 883.
Appellate review of a trial court’s findings in a medical malpractice action is limited. It is well settled that a court of appeal may not set aside a jury’s finding of fact in the absence of manifest error or unless it is clearly wrong, and reasonable inferences of fact should not be disturbed upon review, even though the appellate ^court may feel that its own evaluations and inferences are reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989). In reviewing a factfinder’s factual conclusions, an appellate court must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court’s conclusion, and the finding must be clearly wrong. Kaiser v. Hardin, 06-2092 (La.4/11/07), 953 So.2d 802, 810; Guillory v. Insurance Co. of North America, 96-1084 (La.4/8/97), 692 So.2d 1029, 1031. Where there are two permissible views of the evidence, the fact-finder’s choice between them cannot be manifestly erroneous or clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978). However, if a witness’s story is so internally inconsistent or implausible on its face that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based on a credibility determination. Rosell, supra at 845.

The admissibility of the expert testimony of Dr. Hardin

As a preliminary matter, we first address the qualifications of Dr. Hardin to *97 testify. The plaintiffs tendered Dr. Hardin as an expert medical doctor specializing in the fields of gynecology and obstetrics. La. R.S. 9:2794(D)(1) provides:
In a medical malpractice action against a physician, licensed to practice medicine by the Louisiana State Board of Medical Examiners under R.S. 37:1261 et seq., for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who meets all of the following criteria:
(a) He is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose.
(b) He has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim.
(c) He is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of care.
| is(d) He is licensed to practice medicine by the Louisiana State Board of Medical Examiners under R.S. 37:1261 et seq., is licensed to practice medicine by any other jurisdiction in the United States, or is a graduate of a medical school accredited by the American Medical Association’s Liaison Committee on Medical Education or the American Osteopathic Association.
(2)For the purposes of this Subsection, “practicing medicine” or “medical practice” includes but is not limited to training residents or students at an accredited school of medicine or osteopathy or serving as a consulting physician to other physicians who provide direct patient care, upon the request of such other physicians.
(3) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness is board certified or has other substantial training or experience in an area of medical practice relevant to the claim and is actively practicing in that area.
(4) The court shall apply the criteria specified in Paragraphs (1), (2), and (3) of this Subsection in determining whether a person is qualified to offer expert testimony on the issue of whether the physician departed from accepted standards of medical care.
(5) Nothing in this Subsection shall be construed to prohibit a physician from qualifying as an expert solely because he is a defendant in a medical malpractice claim.
Morehouse objected to Dr. Hardin’s testimony, arguing he was not qualified because he had not delivered a child since the end of 1992 and had no patients since 1992; therefore, he was not actively practicing in the area of obstetrics and gynecology at the time of the event or at the time of trial.
Dr. Hardin testified that he practiced obstetrics and gynecology in Shreveport, Louisiana from 1977 until 1992 when he was severely injured in a hunting accident, rendering him unable to perform surgery or deliver babies. He testified he was the past chairman of the Department of Obstetrics and Gynecology at both P & S Hospital and Christas Schumpert Medical Center in Shreveport. After his accident, he moved to Colorado and has not practiced obstetrics and gynecology since his accident. He further testified:
|UQ. Doctor, you have continuing education from 93 on have you not?
A. Yes.
*98 Q. And you’ve maintained an active license both in the state of Louisiana and required a license in the state of Colorado. Correct?
A. That’s correct.
Q. In addition to that while you have not delivered babies, you have provided medical care to patients during that time frame.
A. Yes, I have.
Q. And that is included areas not normally in — or not limited to obstetrics and gynecology. But you are a medical doctor. Correct?
A. That’s correct.
Q. And that’s the reasons when counsel asked you had you ever provided any medical care to me, you can say yes truthfully. You have because you’re a medical doctor and perfectly capable of doing that. Correct?
A. That’s right.
Q. In your home town in Conifer, there are individuals who come to you for routine medical care do they not? For diagnosis, treatment, that sort of thing?
A. That’s correct.
Q. And you have an active license where you can issue prescriptions and so forth. Correct?
A. Correct.
Q. And in fact do that?
A. I still maintain a federal narcotic license and can write full prescriptions for anything.
Q. So if somebody needs Demerol or any of the narcotics for pain relief, you are perfectly legally entitled to do that?
A. That’s correct.
Q. And the limitation on your active practice is simply related to the physical disabilities that you suffered because of the injury. Not because of any lack of education, training or anything of that nature.
|1fiA. That’s correct.
Q. And you’ve never — your license has not been revoked, rescinded or suspended. Correct?
A. That’s correct.
Q. So everything continues to be just as active. And you could legally if somebody — a pregnant woman walked into this courtroom right now and went into labor, it would be perfectly permissible for you to deliver that child if you could physically do that?
A. That’s correct.
Q. In terms of your continuing education, would you tell us a little bit about what is required?
A. The state of Louisiana requires at least twenty hours a year to maintain your license in Louisiana. And by hours I mean attending post-graduate courses, monthly specialty meetings, etcetera.
Q. Do you have any similar requirements in Colorado?
A. No. Colorado’s requirements are all based around malpractice insurance. And since I don’t carry any, I haven’t followed their guidelines.
Q. So it’s a different set of rules that apply?
A. Right.
Q. But you have for Louisiana, you have met all the requirements to maintain an active license and to be continued to be recognized by our state as an obstetrician and gynecologist.
A. That’s correct.
After Morehouse maintained its objection on the grounds that Dr. Hardin was not actively practicing in the area of obstetrics and gynecology, the trial judge dismissed the jury and discussed the matter with counsel and requested further questioning on the issue of his qualifica *99 tions. Dr. Hardin then stated that he was competent to testify regarding fetal heart monitor strips because the same machines used then are used today. He explained that he had gone to continuing medical education programs since 1992, primarily in the fields of obstetrics and gynecology. bain addition, he testified he was just as qualified to render an opinion as someone who was actively practicing obstetrics today because “it’s almost like riding a bicycle ... [y]ou don’t forget and nothing has changed.” Finally, he testified that in 1999, he was taking care of friends and neighbors, and at the time of trial he was doing the same: “Attending friends, neighbors. I don’t receive pay. It’s good Samaritan type care.” When the trial judge asked if the standard of care that he would testify to had changed since he was disabled in 1992, Dr. Hardin answered that it had not changed, and explained how he knew this:
A. I know from my studying. One thing that prompts me to really keep abreast is the cases occasionally that [the plaintiffs’ attorney] sends me. I do extensive research on any case that he sends me. I spend hours and hours online and study and nothing has changed.
A. For instance for this case I spent probably six hours of research on all the current literature and current journals all the way back to make sure that nothing had changed and it has not in this specific case....
After receiving this testimony, the trial judge ruled as follows:
Okay. Gentlemen, I’m going to let ya’ll question him in front of the jury. And I will tell you now that I believe based on his training and his past experience and continuing education that using my gatekeeper orders by the Supreme Court and by RS 9:2794 that I will allow him to testify. That it goes to the weight or credibility the jury determines, not to the admissibility of his testimony. And I’ve carefully considered and noted that the statute says I shall consider it. And in considering it does not make it mandatory. Any one of these has to be done. I find that he is practicing medicine at the time the claim arose and at the time testimony is given. Not this type of medicine, but I do note that he has significant training since then by continuing to follow up just like any of us could by keep going to continuing legal education. The court notes that practicing medicine under the definitions under two, even includes training residents or students from an accredited school of medicine. So that tells me the statute anticipates that even a training resident if they have enough training and experience could testify as an expert. I think that overall balancing he meets about that even. So the court will allow him to testify.
Morehouse noted its objection for the record.
h7A district court is accorded broad discretion in determining whether expert testimony should be held admissible and who should or should not be permitted to testify as an expert. Cheairs v. State ex rel. Dep’t of Transp. & Dev., 03-681 (La.12/3/03), 861 So.2d 536, 541 (cites omitted). A trial court’s decision to qualify an expert will not be overturned absent an abuse of discretion. Id.
The challenge to Dr. Hardin’s qualifications is that he was not “practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose” as required by La. R.S. 9:2794(D)(l)(a). Subsection D of La. R.S. 9:2794, which contains this requirement, was added by Acts 2003, No. 581, § 1, to *100 provide basic standards for the qualifications for expert witnesses in medical malpractice cases. Minutes of Meeting, House Committee on Civil Law and Procedure, May 12, 2008. According to the Minutes, retired physicians and graduates of non-accredited medical schools are not qualified to serve as expert witnesses under La. R.S. 9:2794 as amended.
Dr. Hardin’s testimony indicated he was disabled but practiced “good Samaritan” type medicine from his home in Colorado, caring for neighbors and friends. He retained his medical licenses and kept abreast of current developments by attending continuing education seminars. The trial judge found that he was qualified, determining he was practicing medicine at the time the claim arose and the time of his testimony, although Dr. Hardin was not practicing obstetrics and gynecology. Considering that even training residents are “practicing medicine,” and considering Dr. Hardin’s significant training by virtue of his continuing education efforts, the trial judge exercised his gatek-eeping function and allowed his testimony.
In our view, this was not an abuse of discretion. The statute does not require that the prospective expert be actively practicing medicine in an organized practice at the time of the incident or at trial. While the statute would not allow retired | isphysicians to testify, in this case Dr. Hardin has maintained his medical licenses, continued to treat patients, albeit gratuitously, and kept up with his continuing education. As the admissibility of his testimony is within the trial court’s broad discretion, we see no abuse of discretion in this ruling. In any event, as will be seen from the discussion below, because we find that any negligence in not reporting the lab results timely did not cause or contribute to Garrett’s injuries as Dr. Ziegler failed to deliver the baby even after he received the results, Dr. Hardin’s testimony regarding the hospital’s negligence for this conduct was ultimately irrelevant and therefore its admission, even if erroneous, was harmless. In addition, La. R.S. 9:2794(D)(1) provides criteria for experts seeking to testify on the issue of “whether the physician departed from accepted standards of medical care.” The testimony Morehouse is contesting, i.e., Dr. Hardin’s testimony that the fetal heart rate monitor strips began to show abnormalities at 3:47, is expert testimony interpreting the strips, not testimony showing that Dr. Ziegler departed from accepted standards of medical care. Further, regarding the hospital’s negligence in failing to alert Dr. Ziegler as to abnormalities in the fetal heart rate monitor strips, as will be discussed further, there was a reasonable factual basis in the record based on the testimony of Dr. Jason Wilson and Nurse Stephenson for the jury to find that the hospital breached the applicable standard of care and that this breach was a cause of plaintiffs’ damages, even in the absence of Dr. Hardin’s testimony.

The jury’s findings that the Morehouse nurses’ conduct fell below the standard of care in failing to timely notify Dr. Ziegler of the PG and L/S ratio laboratory results

The Johnsons claim that the court of appeal erred in overturning the jury’s findings that the Morehouse nurses’ conduct in failing to timely notify Dr. Ziegler of the laboratory results from the PG and L/S ratio tests fell below the standard of care and caused or contributed to Garrett’s injuries.
|1flIn this case, there was a reasonable factual basis for the jury to conclude that the hospital’s failure to convey the lab results for the PG and L/S ratio tests in a timely manner was a breach of the applica *101 ble standard of care. Plaintiffs presented the expert testimony of three physicians to establish the hospital and its personnel breached the applicable standard of care in failing to promptly convey the results of these lab tests: Dr. Aristóteles Pena-Miches, Garrett’s treating pediatric neurologist, Dr. Hardin, and Dr. Robert Katz, a pediatric pulmonologist. The sum of this testimony was that the L/S ratio test was the “gold standard” for determining lung maturity, was never routine, and was necessary to determine whether this baby could be safely delivered. This testimony established the standard of care for reporting the results of these tests was that they be reported by the hospital to the doctor almost immediately, especially in light of Dr. Ziegler’s orders to “Call me when amniotic fluid report is back.” Despite testimony from Nurse Stephenson, who cared for Johnson when she was admitted to the hospital on the afternoon of November 4, Nancy Cook, tendered as an expert in “Clinical Laboratory Science,” and Dr. Jason Wilson, tendered as an expert in “obstetrics and gynecology,” each of whom testified that the hospital lab did not have a duty to report the lab results on November 3, 1999, there was ample evidence in the record to support the jury’s findings that the hospital breached the applicable standard of care in failing to report the laboratory results on November 3, 1999, or promptly on November 4.

The jury’s findings that the Morehouse nurses’ conduct in failing to notify Dr. Ziegler of the PG and L/S ratio laboratory results caused injury to Garrett

The jury answered jury interrogatories 2, 4, and 6 in the affirmative, finding that the hospital’s failure to timely report the lab results when received at 3:28 p.m. on November, 3, 1999, when Johnson was in the emergency room on the evening of November 3, and promptly on the morning of November 4, did “cause any loss, injury li>nor damage to Jonathon Johnson, Belinda Johnson or Garrett Johnson.” The court of appeal reversed, finding the baby’s healthy state three hours after the lab results were reported to Dr. Ziegler indicated the hospital’s failure to timely notify, even if considered to be an unreasonably delayed reporting, was not a cause of the loss, damages or injuries sustained by plaintiffs. 27 So.3d at 1092. The court of appeal also found that Dr. Ziegler’s failure to deliver the baby when he was made aware of the lab reports was negligent and was a superceding cause of the injuries. Id. The Johnsons assign this as error.
The testimony was uncontradicted that the baby’s health at the time Dr. Ziegler examined Johnson during her appointment at around noon on November 4, was not critical. Dr. Ziegler testified that Johnson’s biophysical profile and baseline heart rate did not indicate a “baby that was crashing” and indicated she “could have a little while to be stabilized, get her IV, antibiotics, everything and everybody get there.” According to Dr. Ziegler, “the condition of the baby changed between the time she was in the office and the time she was at the hospital.” Dr. Pena-Miches testified that he thought the baby was okay at the time of her appointment and that the problems developed soon before birth. Dr. Hardin testified that he thought the baby was in urgent, not emergent, delivery status on November 3 and on the morning of November 4, and that the baby’s condition changed between the time of Johnson’s appointment and when she arrived at the hospital a few hours later. Although both these doctors testified that the hospital’s delayed notification of the results caused the baby’s injuries, neither explained how that could be given their testimony that the baby was not critical when Dr. Ziegler received the lab reports on the morning of the 4th or when *102 he examined Johnson at midday, but he nonetheless failed to deliver the baby.
[21We recognize Dr. Ziegler stated in a affidavit that had the results been made available to him when they were reported to the hospital on November 3, he would have delivered the baby during the evening of November 3. However, the assertions in this affidavit are belied by the fact that even after he received the results on the morning of November 4 and had ample opportunity to schedule an immediate C-section, he did not do so. Instead, he testified that he did not schedule the C-section until the evening of November 4 due to the lack of an operating room, the unavailability of Dr. Coats, and because Johnson had taken her insulin and just eaten when he saw her in his office at noon. However, all of these reasons for not scheduling a C-section earlier in the day, at which time the testimony indicated the baby could have been delivered in a healthy state, were discredited. Dr. Coats testified that if Dr. Ziegler had wanted to perform the C-section earlier in the day, he would have rushed to the hospital to assist in the surgery, regardless of whether he had patients to see at his office. Dr. Wilson testified it was customary for operating rooms to become available when an obstetrician needs to perform a C-section immediately. Nurse Lori Priestly, one of Johnson’s nurses on November 4, testified that if a physician needs to perform a C-section immediately, other cases are bumped or delayed. Theresa Hankins, the operating room coordinator at Morehouse, also testified that two of the operating rooms were available from 2:00 p.m. on November 4, and that all but one of the surgeries scheduled that day would have been postponed if Dr. Ziegler needed to perform the C-section sooner. Nurse Priestly also testified that on November 4, she personally asked Johnson when she had last eaten, and Johnson’s medical charts reflect that Johnson had not eaten since 8:30 that morning. Thus, all of Dr. Ziegler’s reasons for not performing the C-section sooner were discredited by the testimony at trial. Further, during cross-examination, Dr. Ziegler was a reluctant and evasive witness. Despite persistent questioning, he refused to 12aadmit that he could have scheduled the C-section any time between 9:00 a.m. and 3:00 p.m. that afternoon, when the child was not in distress. It was not until the trial judge threatened him with contempt of court and incarceration that he finally admitted that he could have performed the C-section earlier in the day on November 4.[9]
*103 Based on the above, we find that jury was manifestly erroneous in finding that the hospital’s delayed notification of the lab results caused injury to Garrett. Given the undisputed testimony that Garrett could have been safely delivered earlier in the day on the 4th, and that Dr. Ziegler did not schedule a C-section until 9 hours after he received the lab results despite the compelling testimony that he could have, we find there was no reasonable factual basis upon which the jury could have found that the ¡^delayed notification caused Garrett’s injuries. Therefore, we affirm the court of appeal’s finding on this issue.

The jury’s findings that the Morehouse nurses’ conduct in failing to notify Dr. Ziegler of abnormalities on the fetal heart tracings on November 4, 1999, fell below the applicable standard of care and caused the injury to Garrett

The court of appeal affirmed the jury’s findings that the Morehouse nurses should have notified Dr. Ziegler of abnormalities on the fetal heart tracings when she was hooked up to the fetal heart monitor on the afternoon of November 4, 1999, and that this failure caused Garrett’s injuries. 27 So.3d at 1093-94. In reaching this determination, the court of appeal found the abnormalities began “at approximately 3:47 p.m. on November 4,1999, and lasted for over an hour prior to Dr. Ziegler’s arrival at Mrs. Johnson’s room.” Id. at 1093.
Morehouse argues that the record does not support the court of appeal’s finding that the fetal heart monitor began to show signs of severe intrauterine distress at 3:47 p.m. on November 4. Further, Morehouse argues the plaintiffs failed to carry their burden of proof that Morehouse’s delay in notifying Dr. Ziegler of the readings caused Garrett’s injuries.[10]
The validity of the jury’s finding on the issue of negligence relating to the fetal heart rate monitor strips is dependent on a determination of when the baby’s condition changed from possibly urgent, as it was when Johnson was examined at Dr. Ziegler’s office around noon on November 4, 1999, to critical, such that an emergent C-section became necessary. The testimony on this issue was conflicting. It was also highly confusing because of bad record keeping on the part of the hospital.
| j^Dr. Hardin testified that when Johnson was seen by Dr. Ziegler at around 1:00 p.m. on November 4, the baby was not critical, as the “beat to beat variability [11] *104 is still good so that makes it not emergent still urgent.”[12]
Dr. Hardin testified as to the baby’s condition when Johnson returned to the hospital on the afternoon of November 4, as directed:
Q. So, around 3:30 she’s in Morehouse General OB. Now, when she gets to the hospital is she placed on a monitor again?
IgüA. Yes, the monitor recordings ... [s]how that she was placed on the monitor approximately 3:47 I believe.
Q. Now, when she’s placed in the obstetrical unit at 3:47 who is in charge of her care? Who is actually, physically monitoring those strips?
A. It would be a nurse.
Q. So, in the obstetrical unit you have nurses trained to look at these strips and know when there’s something good or bad going on?
A. Correct.
Q. Tell the Jury what the strip beginning at 3:47 revealed?
A. In my opinion at that point this baby was emergent or critical. The baby’s heart beat to beat variability we talked about earlier didn’t do the little squiggly line it was just about as straight as I’ve ever seen.
Q. Flat line a 3:47.
A. And in addition to the loss of beat to beat variability there were these late decelerations t[13]] I talked about earlier. *105 They were very subtle but |Ma person trained in reading this any nurse should be able to pick that up if they’ve had adequate training. But immediately there were late, just subtle, late decelerations but that in combination with this straight flat line of the baby’s heart rate in my opinion is a critical situation. I would have done ... if I had seen that at 3:47 within five (5) or ten (10) minutes of making sure I was right I would have ordered the cesarean right then.
Q. So, based on your review at 3:47 she’s one, in Morehouse General OB, she’s on a monitor and she’s under the care of the nurses and the monitor reveals a critical or emergent situation, right? We’ve got a medical emergency?
A. In my opinion, yes. Surgical emergency.
Q. This is a surgical emergency. Do the records reflect that the nurses telephoned or notified Dr. Ziegler of these abnormalities?
A. No.
Q. ... is it the duty of the nurses to notify the doctor when this happens?
A. That is their duty.
Q. By failing to do that in fact they did not notify him until somewhere around 5:00 or 5:10, right?
|a7A. That’s my understanding, from the records.
Q. 5:10, that’s an hour and twenty-three minutes. Now, Dr. Hardin, from the stand point of an obstetrical emergency where a baby is in the condition revealed by these fetal heart monitor strips how long is an hour and twenty-three minutes?
A. Well, it would be like holding your head under water for that long but maybe letting you have just a little bit of air.
Later, Dr. Hardin clarified that Dr. Ziegler should have been notified by “3:55 or so” because it would take approximately 10 minutes to evaluate it and see a pattern. Dr. Hardin concluded that the nurses’ failure to notify Dr. Ziegler of the abnormali *106 ties on the fetal heart monitor strips until 5:10[14] was a breach of the nurses’ standard of care and was a cause of plaintiffs’ damages.
Dr. Ziegler testified that he ordered that Johnson be placed on a fetal heart rate monitor for 30 minutes upon admission and if the readings were normal, the rhythm strip on the monitor could be discontinued. He testified he arrived at the hospital on the 4th “sometime after 5:00 o’clock” after he had finished seeing patients at the clinic, and that he received no notification from the hospital nursing staff that there were abnormalities shown on the heart monitor strip before he arrived at the hospital. Johnson’s chart reflects that at 5:34 p.m.:
Dr. Ziegler in room discussing tubal ligation with patient. Fetal heart rate baseline hundreds, decrease long term variability, no accelerations, no decelerations, patient’s heart rate running 100, discussed with Dr. Ziegler whether this was patient’s heart rate or ... whether it was the patient’s or the fetus. Dr. Ziegler began searching for heart rate.
While he was not asked to interpret the readings on the strip during that time, Dr. Ziegler testified as follows:
Q. Now, can you tell the Jury what ... is it important, let me ask you two things. On a fetal heart monitor strip under these circumstances, if the fetal heart monitor strip showed loss of beat to beat variability and late decelerations would that be an ominous sign?
|28A. That would be a bad sign.
Q. It that the kind of abnormality that a trained obstetrical nurse should be able to see on a fetal heart monitor strip and report to the attending obstetrician?
A. It should be.
Q. All right. If you had been called at 4:00 o’clock and told, Doctor, we’re monitoring Belinda and we’ve noticed loss of beat to beat variability and late decelerations what would you have done?
A. I’d come over and you know, to see it and make sure they were correct about it and we’d speed up her IV, oxygen and put her on the side and maybe give her some breathe ... things than can prove [sic] oxygenation of the fetus across the placenta, things like that. Probably done an ultrasound in the room, things to better evaluate the baby with and see how it’s doing.
Q. Doctor, would it be fair to say that in Belinda’s situation if she was being monitored on the 4th at the hospital and there shown on the fetal heart monitor strip was loss of beat to beat variability and late decelerations that that would equal a surgical emergency?
A. It would definitely necessitate some intervention. It may not indicate a surgical emergency, it might ... in her particular case it would go from that little category like you had this need to do to if you want to call it crash c-section or hurry up and do it as quick as you could.
Q. Crash c-section is a surgical emergency, isn’t it?
A. That’s slang for get the baby out as quick as you can.
Q. When you got there and went into her room and were talking to her and evaluating her and doing those kind of things you looked at the fetal heart monitor strip and low and behold you personally detected at that time, you looked *107 and saw that in fact this is what was going on, correct?
A. I think we said that Lori [Priestly] saw it, that’s the nurse, labor and delivery nurse because I went in ... I didn’t expect any of this. I went in just to get her to sign her ... to get her tubes tied because she decided that she wanted a tubal and Lori said look at this and—
Q. —Did you?
A. Of course I did.
ImQ- All right.
A. And that’s when the bad thing was happening.
Q. And it was exactly this wasn’t it? It was loss of beat to beat variability and late deceleration shown by almost a flat line?
A. I would have to see ■ the monitor strip. As far as I remember it that’s what it looked like to me. Actually it was worse than that. She was having as I remember it she was having severe prolong deceleration in the heart rate. She had been having this earlier in the day which usually frequently indicates acidosis of the fetal brain and poor oxygen profusion of the baby’s heart.
Q. So, when you looked at it you had these problems that were suggestive of acidosis earlier before you got there and when you got there it had progressively worsened to where it was now virtual ... prolonged decelerations, correct?
A. Yeah.
Q. Okay. Doctor, when you saw the prolonged decelerations in conjunction with what was shown earlier in the day, the loss of beat to beat variability and the late decelerations did you order a stat emergent c-section?
A. I didn’t order it we were doing it.
Q. You did it?
A. Yeah.
Q. She was rushed down there and as fast as things could be done you got it done? You got the baby out, right?
A. Yeah, about ten (10) minutes probably.
In conclusion, when asked his opinion whether Morehouse deviated from the applicable medical standards, Dr. Ziegler answered: “That’s hard to say. I don’t know all the legal terms. I just know patients that are in the hospital expect to have good care or safe care. In this unusual situation I don’t think the patient got that.”
Johnson testified relevant to the timing of when the baby became critical and the timing of the events after she was admitted to the hospital on the 4th. Johnson testified in her deposition that she felt the baby move on the morning of the 4th, and _Jjjagain that afternoon while she was home packing she “noticed normal fetal movement.” Johnson testified she arrived at the hospital sometime between 2:00 and 3:00 p.m. on the 4th for her scheduled C-section and that Dr. Ziegler arrived between 5:00 and 5:80. She remembered the following:
A. When Dr. Ziegler came in the room for us to get ready to do this he came in and he looked at the heart monitor thing and he was just like what’s going on, I mean it went crazy from there just from looking at that and it was chaotic, it was crazy from then on.
Q. Okay. So, what you said that was when Dr. Ziegler came into your room at the hospital and looked at the monitor he immediately reacted?
A. Right.
Q. And things became chaotic and they quickly got you into the room for the c-section?
A. Right.
*108 Q. Okay. Now about ... can you just ... and I’m not asking you to be precise but about how long had you been on the monitor at the hospital between the time you got there and were placed on the monitor and when Dr. Ziegler got there and looked at the monitor?
A. I would say at least two and a half hours maybe.
Q. Okay. So, all of that time you were on the monitor, right?
A. Right.
Q. And who was taking care of you? Who was observing you during that two, two and a half hour time frame?
A. I hardly ever seen a nurse but the only one that I remember seeing was Lori [Priestly], she came in there.
In support of Morehouse, Dr. Wilson, a member of the medical review panel, testified consistent with the panel’s opinion that the nurses’ care was within the applicable standard of care. He testified that, like Dr. Ziegler, he relied on his nursing staff to interpret the fetal heart rate monitor strips and notify him “what’s going on on the strip.” Regarding ]s1the strips taken during Johnson’s office visit on November 4, he testified there was not enough on there for him to render an opinion. Regarding the strips taken from the hospital on the evening of November 3, and the evening of November 4, Dr. Wilson testified:
A. I looked at that while y’all were outside and basically the heart beat has a baseline of one forties so that’s the average heart beat if you looked at it over a long period and the beat to beat variability is less ... it’s probably only like one to two beats so its almost ... the heart rate only fluctuates between like one forty and one forty-three or so. One fifty-five. There’s really no accels on this tracing to indicate a reactive NST [non-stress test], I don’t really see any decels. I mean I guess some people could say there was a little drift in the heart rate in some areas, down a little bit below but maybe that was the baseline and the one before it was just a little bit elevated but none of it really in this November the 3rd night shows that the baby was what we call reassuring or reactive on that evening.
A. And I’ve looked already at the 4th as well. Looks like they started this monitoring at about 1600.
A. That’s 4:00 p.m. And when she came in or when the monitor was placed at that point the heart rate was in the one twenties which isn’t, you know, a big deal that it was lower than the day before because the baby’s heart rates, you know, can fluctuate between usually anywhere between one ten and one seventy. Being that it was one twenty when she came in that wasn’t alarming but as you go further into the tracing again it doesn’t really have a lot of reactivity. It’s almost becoming aflat line here about 1:35, You can almost not even distinguish the line because it’s being hidden by the red print on the one twenty. You can hardly make it out so that would mean that the baby has really no reactivity at that point I don’t really see the decels that they were talking about behind these contractions. I don’t see any big dips but then again the heart rate tracing is very flat either meaning the baby is sleeping or that something, you know, bad could possibly be going wrong. We get out here to about 5:00 p.m. it’s still pretty flat and around the one twenties. Nothing exciting and then as we pass up the 1700 mark toward 1710 or 5:10 we start seeing a drift in the fetal heart rate to the one tens, still flat so it’s just kind of a *109 gradual decrease in the heart rate right past 5:15 here. We get out to ... let’s see how far that is. We get out to probably 5:20 and it’s going below one ten and to probably about one zero five, still flat, no big accels or decels behind the contractions. By 1735 or 5:35, the heart rate is at one hundred. We get a little past that to the heart rate drops off the monitor and doubles all the way up to one eighty-five which if that was the baby’s heart ... sometimes the monitor will double the scores so I would say if that was a doubling then you just have to half one eight-five which would make the heart rate I guess around like ninety-two and a half or so. And then |32⅛ gets real patchy. It’s on and off the monitor and I really couldn’t make an interpretation of what’s going on on this strip from about 5:35 on because the baby is not being continuously monitored at that point. It’s falling on and off the monitor and I’m assuming that’s when Dr. Ziegler and the everybody just started ... decided to start moving towards a c-section. (Emphasis added).
As can be seen from the above testimony, Dr. Wilson acknowledged that by 4:35, although the heart rate was in the 120s, it was almost a fiat line indicating no reactivity and no decels behind the contractions, either indicating the baby was sleeping or “something ... bad could possibly be going wrong.” The testimony of Dr. Hardin and Dr. Wilson is conflicting as to when the Johnson was placed on the fetal heart rate monitor. Dr. Wilson’s timing assumes that the monitoring began at 4:00, as this was the time “written in” on the strip by Nurse Priestly,[15] whereas Dr. Hardin’s testimony that it began at 3:47 was from his interpretation of the monitor recording itself. If the monitor began at 3:47, as reflected in the monitor recordings, then Dr. Wilson’s testimony that the flat line began at 4:35 would be inaccurate, as under his interpretation of the readings the flat line would have actually begun at 4:23. If the monitor really did begin at 4:00, then Dr. Hardin’s testimony would have been that the baby was critical at 4:00, as he testified the baby was critical when the readings began.
Morehouse also presented the testimony of Nurse Stephenson, tendered as an expert in obstetrical nursing, in an attempt to prove that Dr. Ziegler was in the room when the fetal heart rate monitor strips began to indicate the baby was in acute distress and that therefore, she had no duty to notify him of the abnormalities. Nurse Stephenson testified that she hooked Johnson up to the fetal monitor “[ijnitially upon admit” on the 4th. She “logged into the computer” at 3:35 and began taking down | ^information from Johnson relevant to her upcoming surgery. She testified that when she put her on the fetal monitor there was “minimal variability.” She further testified that Dr. Ziegler was in the room at that time, i.e., when the monitor was initially turned on and she was inserting an IV into Johnson in preparation for the surgery. Regarding Dr. Ziegler’s orders upon Johnson’s admittance, Nurse Stephenson testified:
A. Okay. He ordered the I.V. fluids that he wanted and he even ordered what size catheter or tube he wanted in her vein and nothing by mouth and then to monitor her for thirty (30) minutes and if it’s okay, the rhythm strip is okay then can DC [discontinue] her which we *110 did not do that, we left her on the monitor partially because when I put her on the monitor the baseline was minimal. There was not a lot of variability ... a lot of ups and downs.
She testified she was concerned about the lack of variability “but the fact that he had seen her in the office helped my feelings and then also there’s a sleep state, if babies go to sleep then they’re heart rate does kind of level out and that causes this minimal variability ...” Reviewing her nurse’s notes chronologically, she testified that the next entry showed the baby’s heart rate was okay and “had some variability but it’s minimal,” explaining “[w]e normally like to see average, ten to fifteen beats a minute and this is three to five which could be explained by a sleep state or some problems.” Again, she testified that Dr. Ziegler was in the room at that time. She then explained there was a computer glitch and she had to be reentered into the computer at 4:34 p.m., while Dr. Ziegler was still in the room. She testified the admissions process was completed at 5:00 p.m. At that time, she left and “Dr. Ziegler was sitting on the bed, on the foot of the bed.” She testified that Nurse Priestly then took over Johnson’s care.
Nurse Stephenson was questioned about what she noticed on the monitor when Johnson was first admitted and why she did not notify Dr. Ziegler of the abnormalities on the strips:
|34Q. ... Now, we’ve talked about what you saw on the monitor and what you documented tell us what you would have done shortly after the admission of Mrs. Johnson if Dr. Ziegler had not been present?
A. If she had continued to have the same minimal variability for thirty (30) to forty-five (45) I would have called him and notified him of that.
Q. Okay. And why did you not have to call Dr. Ziegler?
A. Well, for one thing because she had just left his office and for another because he came in.
On cross-examination, Nurse Stephenson again testified she put Johnson on the monitor at 4:00 and Dr. Ziegler walked in while she was inserting the IV. She explained that although her charting indicated the monitor was hooked up at 3:35, she actually just began the charting at 3:35 and everything she did thereafter was done “under the umbrella of 1535.” However, she could not point to any documentation that showed the fetal heart rate monitor was not begun until 4:00 p.m. When asked if she charted when Dr. Ziegler entered the room and when she brought the monitor strips to his attention, she stated:
A. I don’t know that I reflected it in the ... I don’t think I did but I definitely did. It was my habit when a physician walked into the room I would pull out the monitor screen that sits on top of the fetal monitor, has a three minute ... the fetal monitor paper itself is spit out of the fetal monitor and I would pull it out so that he could see an extended period of time rather than three (3) minutes and I did that that day turning up the volume so he could hear it because he does have a bit of a hearing problem. Anytime I certainly was concerned I would do that. I would not chart that.
Q. Did you report to Dr. Ziegler variability range minimal three to five which you told us earlier that you considered to be ... indicate some problems?
A. He was sitting on the bed.
Q. Did you communicate to Dr. Ziegler?
A. —I turned up the monitor—
*111 IsbQ. ... Did you communicate to Dr. Ziegler your assessment and your evaluation of the fetal heart monitor demonstrated continuing variability range and the minimal levels of three to five beats per minute?
A. I pulled out the monitor strip and I turned up the volume. I made certain that he was looking at the monitor.
Q. Did you bring it to his attention? Did you say Dr. Ziegler, ... let me ask it this way,' real simple. Did you say with Dr. Ziegler apparently as close as you and I are and the patient right here, Dr. Ziegler, I’ve been watching this lady for an hour or an hour and a half now and her fetal monitor strip shows only three to five beats per minute which I believe may indicate some concerns or problems? Did you say something to that effect to him?
A. No.
Q. Okay.
A. Because I don’t say things that are alarming in front of my patients. I made certain that he realized it and then I bowed to his expertise. I don’t point out things that the patient doesn’t have to know at the time to startle her and her family.
Q. Okay. Did you say to him then to avoid startling her Dr. Ziegler I have something I need to talk to you about would you step out here a minute? Dr. Ziegler, I’ve been standing here looking at this fetal heart monitor now for about an hour and I see minimal variability of only three to five beats per minute is that something you think you ought to look into?
A. A good obstetric person does not leave a patient’s bedside when she is in trouble. If you have a concern you do not walk out and leave that patient.
Q. You don’t leave the patient but isn’t the whole point of not leaving the patient to make sure that the patient is being cared for appropriately?
A. He knows more about the fetal monitor than I do.
The next charting information was that Nurse Priestly took over the care of Johnson at 5:27. When asked if there was anyone with Johnson between 5:00, when she testified she left the room, and 5:27, Nurse Stephenson stated that nobody was in the room for a few minutes but that she probably did not just walk out right at 5:00. She could not explain why Nurse Priestly’s notes indicated that Dr. Ziegler was in thejjgroom discussing the tubal ligation at 5:84, contrary to her unsupported testimony that Dr. Ziegler entered the room shortly after 4:00. She also testified that Johnson’s husband was in the room that evening, when the record clearly reflects that he was in fact out of town on a trucking assignment.
Nurse Priestly testified she took over Johnson’s care at around 5:30 and upon entering the room, she saw Dr. Ziegler sitting on the side of the bed going over a consent form. Regarding when she looked at the monitors, what she saw, and what Nurse Priestly said to Dr. Ziegler, she testified:
A. I believe I charted it at around 5:34.
A. I noticed that the heart rate was at one hundred which a normal heart rate is around one ten to one sixty on a fetus.
A. I went to her bedside to see if ... to try to see if it was momma’s heart rate or baby’s heart rate because a lot of times the monitor will slip off the momma’s tummy and it will pick up mother’s heart rate instead of the baby’s so you can usually feel mother’s pulse and see if *112 the heart rate on the monitor is coordinating with the pulse of the momma and at that point it was not.
Q. Okay. Uh, did you communicate ... have any communicating with Dr. Ziegler?
A. I just brought it to his attention, I said well let me check and see if this is momma or baby. I asked him if it had been running in the hundreds. I believe he said he didn’t notice if it did nor hadn’t been.
Q. To your knowledge when you entered the room was Dr. Ziegler paying attention to the monitor?
A. No.
Q. So, to be perfectly clear on this you called that monitor printout to Dr. Ziegler’s attention?
A. Yes.
|37Q. And you actually caused him to look at the monitor?
A. Yes.
Q. Now, what did Dr. Ziegler do after that? When you caused him to look at the monitor what did he do?
A. He took the monitor from me to see if he could find it ... see if he could find a better heart beat than a hundred.
Q. And about how long did Dr. Ziegler spend with the fetal monitor?
A. I believe a total of ten (10) minutes.
Q. An what was he doing during that ten (10) minutes?
A. Just moving the monitor around trying to pick up a heart beat.
She testified that he next ordered Brethine to relax the uterus muscles so that the baby could get more blood flow during contractions. At 5:50 the baseline fetal heart rate fell to eighty with no variability, no accels, and no decels. At 5:55 Johnson was rolled into surgery, and an emergency C-section was performed at 6:00. She testified that if Dr. Ziegler had not been in the room when she arrived in the room at 5:34 and saw the monitor strips, she would have “applied oxygen, called him and probably been drawing up some Brethine while [she] was calling him.”
Finally, the expert testimony of Drs. Pena-Miches, Hardin, Katz, and Wilson established that the hospital was responsible for staffing the obstetrical unit with nurses trained and capable of reading and interpreting the monitors and that physicians depend on the hospital staff in such situations to carry out their orders to monitor the patient and report immediately any abnormalities which could indicate problems or issues with the mother or child.
The preceding review of the testimony indicates there is a factual basis for the jury to find that Morehouse fell below the standard of care in failing to report the abnormalities on the fetal heart tracings and that this failure caused injury to Garrett. _JjgFirst, with the exception of Nurse Stephenson, all of the testimony and evidence presented established that Dr. Ziegler arrived at Johnson’s hospital room sometime between 5:00 and 5:30 p.m., with Nurse Priestly’s notes specifically stating that Dr. Ziegler was seated at her bedside at 5:34 p.m. when she first walked into the room. Nurse Stephenson’s testimony that Dr. Ziegler arrived in the room while she was insérting Johnson’s IV, which would have been approximately 4:00 p.m., was discredited by Johnson and Dr. Ziegler’s testimony that he did not arrive until after 5:00. It is further discredited by Nurse Priestley’s testimony that she first alerted Dr. Ziegler to the monitor readings at 5:34, and Johnson’s testimony that once Dr. Ziegler arrived in the room, he immediately saw the monitor and things shifted *113 into an emergency status. Further, it is simply implausible to believe that Dr. Ziegler would arrive in Johnson’s room and sit at her bedside for one and one-half hours doing nothing but go over a consent form for a tubal ligation. Second, Dr. Hardin testified that the monitor recordings showed Johnson was placed on the monitor at 3:47 and at that time, the strips showed the baby in critical condition, with no beat to beat variation. Dr. Wilson’s testimony was that Johnson was placed on the monitor at 4:00 and the flat fine, i.e., no beat to beat variations, began at 4:35. Nurse Stephenson stated that the strips showed a lack of variation on the beat to beat ratio when Johnson was placed on the monitor, although it is unclear if this was at 3:47 or 4:00. What is clear is that, regardless of whether the monitor was started at 3:47 or 4:00, the flat line was present at 4:35 at the very latest. Drs. Ziegler, Hardin, and Wilson and Nurse Stephenson testified that lack of beat to beat variation indicates the baby is potentially in a critical state that needs to be immediately evaluated. Dr. Wilson testified that the strips would then need to be reviewed to make sure of a pattern indicating the baby is critical. Drs. Wilson, Hardin and Ziegler testified that an emergent C-section would need to be performed at that time. While Nurse Stephenson testified she did [ sanot need to alert Dr. Ziegler to the abnormalities on the strips because he was in the room at that time, the overwhelming majority of the evidence indicates that Dr. Ziegler was not in the room at that time. Thus, the jury had a reasonable factual basis to find that the monitor readings showed abnormalities indicating the baby was critical by at latest 4:35, that these abnormalities were not reported to Dr. Ziegler by the nurses although the standard of care required that they do so, that Dr. Ziegler did not arrive in the room until almost an hour later, and that had Dr. Ziegler been alerted to the readings he would have come immediately over and ordered a C-section and the baby could possibly been delivered in a healthy state. For these reasons, we find the jury’s verdict that Morehouse committed medical malpractice in failing to timely report the abnormalities on the fetal heart rate monitor strips and that this caused injury to Garrett was not manifest error.

The jury’s finding that Dr. Ziegler was negligent but that his negligence was not a superceding cause of the damages and its apportionment of fault

The jury found that Dr. Ziegler’s conduct fell below the applicable standard of care in his treatment of Johnson and caused damage to Garrett and that his negligence was not a superceding cause of Garrett’s injuries. The jury apportioned 80% of the fault to Morehouse and 20% of the fault to Dr. Ziegler. The court of appeal found Dr. Ziegler’s negligence in failing to schedule a C-section after being notified that the lungs were mature was a superceding cause of Garrett’s injuries. 27 So.3d at 1093. The court of appeal reapportioned fault, with 20% to More-house and 80% to Dr. Ziegler.
Morehouse argued at trial that Dr. Ziegler was negligent in his treatment of Johnson and that his negligence was the sole cause of Garrett’s injuries. Specifically, Morehouse argued that Dr. Ziegler’s conduct fell below the standard of care because he forgot about the lab tests he ordered on the amniotic fluid, when he received the |40results he did not act quickly enough in delivering the baby, and that he was in the room at 4:00 when the fetal monitoring strips began to show the baby was critical. Therefore, the nurses had no duty to notify him of the abnormalities on *114 the strip.[16] The plaintiffs also argue that the court of appeal erred in substituting its own judgment in reassessing fault 80% to Dr. Ziegler and 20% to Morehouse
Dr. Wilson testified regarding Dr. Ziegler’s conduct throughout this three-day period and the actions Dr. Ziegler should have taken. In interpreting Johnson’s chart from the night of November 8, he stated the following:
Heart rate was one forties to one fifties. Said there may have been some long term variable, I think that’s a plus sign. Says here there were no accelerations or decelerations noted. The no decels is encouraging but the no accels is not reassuring. So, you know, from what she’s documented that is not really considered a reactive NST at that point. There’s another thing called a contraction stress test and if she was having no decels and the contractions were every three (3) minutes and you had three (3) of them within ten (10) minute period than that would have been reassuring that there were decels but the contractions were further apart. He goes on to say that he was at the hospital that day and that he evaluated the patient. Says here complained of some decrease in fetal movement and past not feeling good the last few days ...
Dr. Wilson noted that Dr. Ziegler’s notes from that day stated “[sjtill waiting amniotic fluid studies on baby from Tuesday amnio ... Would like to deliver ASAP if fetal lung maturity acceptable since she is a diabetic.” In reviewing Dr. Ziegler’s testimony, Dr. Wilson noted that when questioned as to whether he reviewed the fetal heart rate strip on the night of the 3rd, Dr. Ziegler answered that he counts on his nursing staff to look at and interpret the strip, and that he did not look at the strip that night. When asked what he would have done, Dr. Wilson answered:
|41A. Well, I may still have written a note but if I had been at the hospital during, you know, at least till 8:30 that evening and she had been on the monitor since 8:00 p.m. or 8:05 p.m. I probably would have at least eyeballed the tracing that evening before I left. He could of at least looked at twenty to twenty-five minutes of the strip to determine whether there was a reactive NST or not.
Q. Dr. Wilson, had you been waiting on a L/S ratio test on November 3rd this evening what would you have done?
A. Again it depends on the patient and the reason that you’ve ordered the test in the first place. I order lots of tests and I can’t ... I guess you know, if I ordered thirty (30) or forty (40) lab tests a day you have to decide the priority of which ones you need to know in a quicker fashion. I’m not sure what Dr. Ziegler’s thinking was on the 2nd but if he was holding the patient NPO [17] and *115 wanted to deliver the patient ASAP or you know, to prevent anything bad from happening and make sure that the lungs were mature then that would be one of my higher priority labs that I would want to follow up on. They’re different ways of following up on labs. Sometimes I’ll just have my patients, I’ll tell them I’m going to order this lab and it may not be back on my desk for a week but you need to know the results tomorrow so I’ll have those patients call me the next day to prompt me to look for them. Other ways you could ... you know, every lab you order during the day if there’s one you need to definitely remember to check on the next day sometimes I’ll make a notation in my calendar with the patient’s name and the lab result and I make sure I go back personally and find that lab the next day. I guess the third way is if you’re very concerned about getting a lab result back especially in a patient that you discharged home usually I would call the lab or make sure that it is placed personally on the requisition form that will be typed into the lab computer. I would either call the lab myself and tell them to put it in their computer or I’d write on the doctor’s order to note make sure to write on requisition form to call me with the lung maturity studies.
Dr. Wilson testified that after being notified by phone on the night of the 3rd that there were no accels or decels, instead of allowing Johnson to go home, he would have either been prompted to check on the lab results so he could perform a C-section that night or would have done a bio-physical profile and kept her overnight if it was six out of ten or below. Once Dr. Ziegler received the results on the 4th, he should |4ghave delivered the baby “ASAP” like he charted he was going to do from the beginning. Finally, as to the standard of care, Dr. Wilson testified:
Q. Okay. What did the standard of care require Dr. Ziegler to do in this case?
A. Uh, the standard of care for Dr. Ziegler is that he ordered a test that was delaying a procedure that he wanted to do and I would assume that since he had ordered a test that he thought was so important to delivery [sic] the patient ASAP that he would remember that he ordered the test, follow up on the test and subsequently act upon those results in the manner he had planned on acting on them in the beginning.
In addition, he testified that if Dr. Ziegler was concerned about delivering the baby because of fetal lung immaturity, he could have transferred the patient to a facility that had an NICU unit or to Shreveport which offers a higher level of obstetrical care, and another doctor would have been responsible at that point.
So, in Dr. Wilson’s opinion, Dr. Ziegler’s conduct fell below the standard of care in that he did not at least look at the fetal heart monitor the night of the 3rd, nor did he call the lab to check on the results which he needed “ASAP,” nor did he do another bio-physical profile to reassure himself, nor did he transfer Johnson to another facility where she and the baby could have received more specialized care in case the baby had to be delivered with concern over the fetal lung maturity. Further, Dr. Wilson’s testimony provided a reasonable factual basis for the jury to find that Dr. Ziegler’s conduct fell below the standard of care because once he received the results on the 4th, he should have “acted on them in .the manner he planned on acting on them in the beginning,” i.e., “deliver ASAP if fetal lung maturity acceptable since she is a diabetic.” Regarding causation, the jury could have reasonably relied on the testimony of Dr. Pena- *116 Miches that “the patient was okay at Dr. Ziegler’s office on November 4th and that the problems developed soon before his birth.” Based on the sum of this testimony, the jury was not manifestly erroneous in finding that “Dr. 143Ziegler fell below the applicable standard of care in his treatment of Belinda Johnson” and that “this failure cause[d] loss, injury, or damage to Garrett Johnson.”
However, the jury found Dr. Ziegler’s malpractice was not a superceding cause of Garrett’s injuries, although they apportioned 20% of the fault to Dr. Ziegler. It is unclear from reading the jury verdict form whether the jury found Dr. Ziegler negligent in relation to his treatment of Johnson on November 3 and during the office visit of November 4 wherein he failed to order an immediate C-section, or whether the jury found he was at Johnson’s hospital bedside at 4:00 and therefore negligent because he did not order a C-section until 6:00. We have already found that it was manifest error for the jury to find Morehouse’s negligence in failing to timely report the results of the L/S ratio and PG tests was a cause of Garrett’s injuries because Dr. Ziegler did not order an immediate C-section even after receiving the results. We have also found that the record supports the jury’s finding that Morehouse was negligent in failing to timely notify Dr. Ziegler of the abnormal test strip readings and that this was a cause of Garrett’s injuries, partly because the record supports a finding that Dr. Ziegler was not in the room at 4:00 as claimed by Nurse Stephenson. Thus, it is within these parameters that we will analyze Dr. Ziegler’s conduct.
The court of appeal found Dr. Ziegler’s conduct in failing to order a C-section immediately upon receiving the lab results was a superceding cause of Garrett’s injuries. A superceding or inteiwen-ing cause is one which comes into play after the defendant’s negligent conduct has ceased, but before the plaintiff suffers injury. Adams v. Rhodia, Inc., 07-2110 (La.5/21/08), 983 So.2d 798, 808 (citing RESTATEMENT (SECOND) OF TORTS § 440 (1965); 1 DAN B. DOBBS, THE LAW OF TORTS § 186 (2001)). In situations in which there is an intervening force that comes into play to produce the plaintiffs injury (or more than one cause of an accident), it has generally been held that the initial tortfeasor will not be relieved of |44the consequences of his or her negligence unless the intervening cause super-ceded the original negligence and alone produced the injury. Id. (citing Arcadian Corporation v. Olin Corporation, 01-1060 (La.App. 3 Cir. 5/8/02), 824 So.2d 396, 405,) writ denied, 02-1930 (La.10/25/02), 827 So.2d 1174; Mendoza v. Mashburn, 99-499 (La.App. 5 Cir. 11/10/99), 747 So.2d 1159, 1168, writ denied, 00-0037 (La.2/18/00), 754 So.2d 976; Domingue v. State Department of Public Safety, 490 So.2d 772, 775 (La.App. 3 Cir.1986). If the original tort-feasor could or should have reasonably foreseen that the accident might occur, he or she will be liable notwithstanding the intervening cause. Id. In sum, foreseeable intervening forces are within the scope of the original risk, and hence of the original tortfeasor’s negligence. Id. (citing Miller v. Louisiana Gas Service Co., 601 So.2d 700, 705 (La.App. 5 Cir.), writs denied, 604 So.2d 999 (La.1992), 604 So.2d 1001 (La.1992) (citing PROSSER AND KEETON, LAW OF TORTS (4th ed.1971) at 273-74, 288)).
The record reflects that had he scheduled a C-section promptly after receiving the results, Garrett most likely would have been healthy. In this case, the hospital could not have foreseen that after receiving the results of lab test that Dr. Ziegler was awaiting in order to immedi *117 ately schedule a C-section in the event the results showed the lungs were mature, that Dr. Ziegler would nonetheless wait nine hours before scheduling the C-section. In that nine hours, the baby’s condition became critical. Therefore, as it relates to Morehouse’s conduct in not timely reporting the results of the amniotic fluid tests, the court of appeal found Dr. Ziegler’s negligence was a superceding cause of the resulting damages. However, this is a difficult case because a superceding cause is technically the last act of negligence and is usually determined to be the sole cause of the injury. Here, a second act of negligence, that of the nurses not alerting Dr. Ziegler to the abnormalities on the fetal heart rate monitor strips, was also a cause of Garrett’s injuries and occurred after Dr. Ziegler’s acts of negligence. |45Thus, in this case, Morehouse committed two acts of negligence, and Dr. Ziegler’s conduct could possibly be a superceding cause as to the first act, but not the second act. Therefore, the jury was correct in finding Dr. Ziegler’s negligence was not a su-perceding cause of the injuries, because if they had that would have resulted in 100% of the fault being attributed to Dr. Ziegler. There is a reasonable factual basis in the record for the jury’s attributing fault to both Morehouse and Dr. Ziegler. There is evidence that had Dr. Ziegler performed an immediate C-section after learning the lungs were mature, the baby could have had a healthy outcome. However, this evidence also supports a finding that even if a C-section had been performed as soon as Johnson was admitted and the strips were abnormal, that the baby may still have had a healthy outcome. Thus each act caused Garrett to suffer damage. As we have stated, “there can be and frequently is more than one cause of a plaintiffs damages.” Hall v. Brookshire, 02-2404 (La.6/27/03), 848 So.2d 567, 576. As both Morehouse and Dr. Ziegler eommit-ted medical malpractice and both contributed to Garrett’s injuries, La. C.C. art. 2323 applies and the degree of fault of each must be determined and fault apportioned. Miller v. LAMMICO, 07-1352 (La.1/16/08), 973 So.2d 693, 705 (“It is well-settled that the comparative fault regime applies to liability based on medical malpractice.”)
In light of our reversal of the jury’s finding that Morehouse’s fault in not timely transmitting the results of the L/S ratio and PG tests was a cause of Garrett’s injuries, the jury’s apportionment of 80% fault to Morehouse cannot stand. Pursuant to Clement v. Frey, 95-1119, 95-1163 (La.1/16/96), 666 So.2d 607, after an appellate court finds a “clearly wrong” apportionment of fault, it should adjust the award, but only to the highest or lowest point respectively which is reasonably within the trier of fact’s discretion. Brewer v. Hunt, 09-1408, 09-1428 (La.3/16/10), 35 So.3d 230, 244. The factors enunciated in Watson v. State Farm Fire & Casualty Insurance Co., 469 So.2d 967 (La.1985), are applicable to this determination. Clement, supra at 611. In Watson, this Court set out the factors that may influence the degree of fault assigned as follows: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste without proper thought. 469 So.2d at 974.
After considering these factors, we find that 50% is the highest amount of fault the trial court could have reasonably allocated to Morehouse, and 50% is the lowest amount of fault the trial court have reasonably allocated to Dr. Ziegler. Accordingly, *118 we apportion 50% of the fault to More-house and 50% of the fault to Dr. Ziegler.
CONCLUSION
In this case, both the hospital and the doctor committed medical malpractice in their treatment of Belinda Johnson, and each act of malpractice was a cause of Garrett Johnson’s injuries. While More-house fell below the standard of care in failing to timely report crucial lab reports to Dr. Ziegler relative to the maturity of Garrett’s lungs, this act did not cause Garrett’s injuries because Dr. Ziegler failed to perform the required action even after receiving the lab reports. Dr. Ziegler’s failure to order the C-section as soon as possible after receiving the test results constituted medical malpractice which contributed to Garrett’s injuries. Morehouse again committed malpractice when its staff failed to notify Dr. Ziegler of abnormalities on the fetal heart rate monitor strips, abnormalities which would have alerted Dr. Ziegler of Garrett’s critical condition. This was another cause of Garrett’s injuries given the dramatic decline in Garrett’s heart rate between the time Dr. Ziegler should have been notified and the time he was actually notified. Because of our ruling that the trial court was clearly wrong in finding Morehouse’s failure to notify Dr. Ziegler of the |47lab results caused Garrett’s injuries, we reallocate fault pursuant to Clement, supra, and find that fault should be apportioned equally between Morehouse and Dr. Ziegler.
DECREE
For the reasons stated herein, the judgment of the court of appeal is affirmed in part and reversed in part, and judgment is hereby entered assessing Morehouse General Hospital with 50% of the fault.
AFFIRMED IN PART; REVERSED IN PART; RENDERED
JOHNSON, Justice, dissents for reasons assigned by GUIDRY, J.
KNOLL, Justice, dissents in part and concurs in part and assigns reasons.
GUIDRY, Justice, dissents and assigns reasons.
CIACCIO, Justice, concurs.

 Retired Judge Philip C. Ciaccio, assigned as Justice ad hoc, sitting for Chief Justice Catherine D. Kimball; Retired Judge Moon Lan-drieu, assigned as Justice ad hoc, sitting for Justice Marcus Clark, recused,

. Dr. Ziegler explained the reasons for delivering babies bom of insulin dependant diabetic mothers early:
Uh, insulin dependant diabetics there's a situation where they have this unexplained fetal demise and it’s pretty much limited to insulin dependant diabetics because it’s associated with the effect of the diabetes on the vascular supply of the placenta and it happens around thirty-four (34), thirty-five (35), thirty-six (36) weeks so when patients begin to get signs like decreased movement, insulin requirements change, going down well then you begin worrying more about that. Forty (40) years ago that was the most common cause of fetal demise or still born babies in insulin dependant diabetics. It’s gotten a lot better now it’s the number two. So, at this point of course I didn't know ... nobody could know what was going to happen a week later but I was concerned and I wanted to get her delivered as soon as I possibly could so that hopefully we could prevent that from happening.
Testimony also indicated another risk associated with babies of insulin dependent diabetic mothers is delayed lung maturity.

. As will be explained more fully, testimony indicated that the absence of accelerations or decelerations could be cause for concern about the baby’s health, could mean the baby was sleeping, or could mean that the test was not sensitive enough to pick up the variations.

. In his affidavit, Dr. Ziegler stated the following:
1. That on November 2, 1999, he ordered phosphatidylglycerol and L/S ratio tests to determine fetal lung maturity regarding Belinda Johnson’s unborn fetus, and that Morehouse General Hospital was instructed to call him upon its obtaining the test results. He expected the Hospital’s staff to *93 call him upon their receipt of the test results.
2. That the results from said tests were reported to Morehouse General Hospital on November 3, 1999, and were indicative of fetal lung maturity.
3. That he was not made aware of said test results, however, until November 4, 1999.
4.That had he been made aware of the test results when they were reported to Morehouse General Hospital on November 3, 1999, he would have notified Belinda Johnson and would have delivered the fetus during the evening of November 3, 1999.

. Pursuant to La. C.C. art. 2323(A) and (B), under our comparative fault system, the percentage of fault of all persons causing or contributing to, the injury must be determined, even if that person is not a party to the action.

. The plaintiffs answered Morehouse’s appeal to the court of appeal, asserting that the trial judge erred in reducing the judgment to a single $500,000.00 cap. However, this finding was not assigned as error in these writ applications and will not be considered.

. In addition, the court of appeal found objectionable statements made by plaintiffs' counsel during opening and closing arguments, wherein he stated that Morehouse was the only party from whom the plaintiffs could receive a money judgment and accused More-house of submitting an incomplete copy of the fetal heart monitor strips to the plaintiffs because they "had something to hide,” did not prejudice the jury against Morehouse. The court of appeal found the trial judge sufficiently admonished the jury, both at the start of the trial and after the parties had rested, and this was sufficient to counteract any possible adverse effect of counsel's statements.

. By letter dated May 7, 2010, the Court requested that the parties "address the primary issue of manifest error as well as any secondary issues pertinent to the parties position.”

. La. R.S. 9:2794(A) provides:
In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., a dentist licensed under R.S. 37:751 et seq., an optometrist licensed under R.S. 37:1041 et seq., or a chiropractic physician licensed under R.S. 37:2801 et seq., the plaintiff shall have the burden of proving:
(1)The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

. During cross-examination, the following exchange occurred:
[The Court]: You’re putting me in a situation that I don’t like to be in because I’m getting ready to have to find you in contempt of court. I have several options and one of which is to put you in jail, recess this trial until sometime next week and then try it again. I don’t want to do that.
[Dr. Ziegler]: Yes, sir.
[The Court]: Okay. To help me so I don't have to put you in jail explain to me how you can tell me hypothetically that you can do a c-section right here on a lady right here, right now but then in the same breath say I can't answer your question because it’s a hypothetical.
[Dr. Ziegler]: Well, I could do it, Your Honor but I would have to—
[The Court]: —And that’s all he asked you could you have done it if you had wanted to. Can you answer that question or do you want me to get him to re-word it and see if you can answer it?
[Dr. Ziegler]: I’d like for him to ask it for me one more time.
[Defense attorney]: Dr. Ziegler, continuing right where we left off if the hospital had available personnel, if the hospital had an available operating room, if Dr. Coats was available on November the 4th, 1999 then you could have performed the c-section on Belinda Johnson at Morehouse General Hospital on November ... at noon, at 1:00 *103 or at 2:00 if you chosen [sic] to do so, correct?
[Dr. Ziegler]: Correct.

. Morehouse argues that the court of appeal erred in finding the improper admission of Dr. Hardin’s testimony was harmless error, asserting he was the only expert who testified that the fetal distress began before 5:00 p.m. and both the jury and the court of appeal adopted his opinion as fact. The plaintiffs allege that the court of appeal erred in finding Dr. Hardin’s testimony inadmissible. These arguments were resolved at pages 12-18, supra.

. Dr. Hardin explained "beat to beat variability” as follows:
A. Beat to beat variability is the minor variation in rate that the heart is beating. Babies’ hearts normally beat around one twenty or so. And it fluctuates from one fifteen to one twenty-five normally. And for instance there's two types of beat to beat variability. One is short term beat to beat variability. That means over a few seconds. And then there's long term beat to beat variability which you want to see greater excursions of the baby's heartbeat, greater changes. And that happens over a period of minutes or hours. And that happens in response to a contraction or when the baby moves. If you start lacking your legs or run a little bit, your heart rate goes up. And that means you’re healthy because you can do that. And a baby is the same deal. *104 When he moves around inside the mother, his heart rate will jump up ten or twenty beats per minute faster. It'll go from one fifteen up to one twenty-five. And that just indicates a good healthy baby. So there's two parameters. There's the beat to beat happening second by second. And then there's these reactions when he moves or something stimulus occurs.
Q. We hear terms about loss of beat to beat variability. That's a bad thing. Right?
A. Right.
Q. And can you tell the jury what loss of beat to beat variability means?
A. Well, a loss of beat to beat variability means that the baby’s heart is losing — his nervous system that controls his heart call autonomic nervous system in everybody's body. And it has the — it works off of the brain. And it has the job of changing the heart rate when the baby moves. Just like when you run you start getting short of breath, you autonomic nervous system makes you breathe faster to get more oxygen. The same type of principal. Does that answer your question?
Q. There's another term that we hear and that’s late decelerations. Is that a bad thing also?
A. That's a real bad thing to see.

. The testimony indicated that "emergent for obstetrical care means you've got a baby that’s dying in útero” and you need to deliver immediately, whereas "urgent" means reasonable haste in delivery is required but it may be reasonable to further assess the situation to make that determination.

. Dr. Hardin described "late decelerations” as follows:
A. We talked about two lines. Here is the bottom line which is — -it’s a pressure monitor around the mother. And it’s determining how hard the uterus gets during contraction. And when it's relaxed it's down here and then slowly she starts a contraction. And it goes up and then it goes away. And it goes on a minute or two until the .next contraction. And here’s what we’ve got beat to beat variability going along which is second to second, short term beat to beat. And that's a good pattern. And the contraction starts and say it stays the same. But right about the top of the contraction this heart rate drops down, stays down for undetermined length of time. And usually comes back up depending on how sick the baby is. You should never see that. Never. What’s happening is the mother’s uterus is getting real hard and contracting. So the blood vessels in the uterus are not letting the blood and oxygen get through so it can pass oxygen to the *105 baby. Now a baby that’s healthy it doesn’t do this to it. Because they’ve got the reserve. They're in good shape. They’ve already got plenty of oxygen in their body. So their heart rate sometimes with a contraction like you mentioned earlier will go up a little bit and come down right over the contraction. Sometimes it will go down right during the contraction. Those are not worrisome. It's this one here and you know that happened because the placenta is not getting enough oxygen to the baby. That’s about the only reason that the heart rate will go down in what's called a late deceleration. So this is a real ominous sign. Now this can be not so dramatic. And in this particular case the strips I reviewed, it didn't go down very much. It was just — it was coming along like this and it went down just a little bit right here. Not even that much. But you could see it. It was there. Anybody trained should have been able to see that. The other thing in this case is the fact that the heart rate on a sick baby doesn't do these beat to beat moment to moment variations. Because his automatic nervous system in his brain is suffering from a lack of oxygen. So he can’t respond normally by changing his heart beat two or three.beats every second or so. So his heart rate, it still has a little squiggle to it, but it looks about like this. See that little squiggle I'm doing? That’s about the only squiggle it has.
Q. But it’s supposed to have—
A. Supposed to look like this. So that’s one key. Now when babies sleep there is a little less movement, but it’s not that dramatic. A sleeping will be — you can tell it will still do some changes. It’s just not a straight line. That's probably a sleeping baby. This is probably an awake baby.
Q. A healthy awake baby.
A. Healthy. A baby with straight a line, even though it’s still got a few little squiggles is not sleeping. He's sick. He’s lacking oxygen.
Q. And a lack of oxygen is the critical issue in a baby?
A. Yes.

. The basis for this 5:10 timing is unclear, as the evidence shows he was actually notified by Nurse Priestley at 5:34 and that is what plaintiffs argued at trial.

. Nurse Priestly testified that she wrote the time on the strips after the events of that night were over. She had marked the time of the surgery on the strips from looking at her watch at that time, and later that night counted back using the minute markings on the strips to get to 4:00 as the time the monitoring began.

. The trial judge denied plaintiffs’ request for a directed verdict at the close of the evidence, wherein they argued that Morehouse did not produce evidence of the standard of care applicable to Dr. Ziegler, that Dr. Ziegler’s conduct fell below that standard of care, or that any breach caused injuries to Garrett. After careful consideration, the trial judge denied the motion finding Dr. Wilson and Dr. Hardin testified regarding whether Dr. Ziegler deviated from the standard of care after being notified of the results and conducting a biophysical profile that produced results of a four out of ten, and that the jury could decide whether to believe Nurse Stephenson or Dr. Ziegler as to what time Dr. Ziegler arrived at Johnson's bedside on the 4th. The trial judge considered that Dr. Pena-Miches offered evidence on causation.

. “NOP” is a medical instruction to withhold oral food and fluids from a patient for various reasons; evidently here it would be in preparation for possible surgery.