# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**13-1369**


**REBECCA VALLERY, ET AL.**

**VERSUS**

**M. LAWRENCE DRERUP, ET AL.**


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 237,118
HONORABLE JOHN C. DAVIDSON, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**MARC T. AMY**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of John D. Saunders, Marc T. Amy, and J. David Painter, Judges.


**AFFIRMED.**

**Gordon E. Rountree**
**Rountree, Cox, Guin & Achee**
**400 Travis Street, Suite 314**
**Shreveport, LA 71101-5556**
**(318) 226-0993**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Rebecca Vallery**

 **Madeline Lee**
**Bolen, Parker, Brenner, Lee & Engelsman**
**Post Office Box 11590**
**Alexandria, LA 71315-1590**
**(318) 445-8236**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Rebecca Vallery**

Eugene J. Sues
Gold, Weems, Bruser, Sues & Rundell
Post Office Box 6118
Alexandria, LA   71307-6118
(318) 445-6471
COUNSEL FOR DEFENDANTS/APPELLEES:
    Louisiana Medical Mutual Insurance Company
    M. Lawrence Drerup

**AMY, Judge.**

The plaintiff alleged that the defendant neurosurgeon breached the applicable standard of care by failing to identify and report a fractured bone graft and incomplete fusion following a cervical fusion surgery. The plaintiff asserted that the defendant further breached the standard of care by failing to inform her that smoking cigarettes prior to and after the surgery could hinder the progress of the fusion. After a Medical Review Panel found in favor of the defendant, the plaintiff proceeded to a bench trial. The trial court found in favor of the defendant. The plaintiff appeals. For the following reasons, we affirm.

### Factual and Procedural Background

Rebecca Vallery[1] began treatment with the defendant neurosurgeon, Dr. M. Lawrence Drerup, in May 2005 due to ongoing complaints of neck and arm pain. Dr. Drerup's diagnosis of Ms. Vallery's condition included cervical radiculopathy, stenosis, and disc herniation at the C6-C7 level and disc protrusion at the C4-C5 level. After conservative therapies did not provide Ms. Vallery with relief, Dr. Drerup performed an anterior cervical diskectomy and fusion of the C5-C6 and C6-C7 levels, with anterior cervical fixation in July 2005. Ms. Vallery explained that, although she was provided with initial relief following the surgery, the pain returned as her activity increased.

As Ms. Vallery's complaints of pain continued, she underwent a myelogram and post-myelographic CT scan, which revealed post-operative changes associated with the fusion surgery, and a central disc protrusion at the C4-C5 level that appeared larger than on the prior test. Thereafter, in November 2005, Dr. Drerup

---

[1] The transcript in this matter indicates that, at the time of trial, Ms. Vallery, was using her maiden name of "Lalonde," following her divorce. We use Ms. Vallery's married name, however, to be consistent with the case caption, record, judgment, and appellate briefs.

performed surgery that involved the removal of the prior cervical plate, a cervical discectomy/fusion at the C4-C5 level and scar resection, and anterior cervical fixation, expanding the level of fixation to C4-C7. Ms. Vallery explained that she again had an initial easing of her symptoms, but that the pain returned following increased activity.

In the following months, Dr. Drerup prescribed treatment at a physical therapy clinic, which eventually involved physical exercises. However, Ms. Vallery experienced pain in performing those exercises and, additionally, continued to experience pain in the performance of her work duties as a hair stylist and salon owner. By December 2005 – January 2006, and upon review of x-rays which were reported to evidence stable bony alignment and hardware alignment, Dr. Drerup determined that the plaintiff's pain stemmed from posterior cervical myofascial syndrome.

By March 2006, Ms. Vallery's complaints had not resolved and involved pain in the cervical trapezius area. Dr. Drerup's notes reveal that, upon review of a cervical myelogram and post-myelographic CT, there was no evidence of significant pathologic changes to account for Ms. Vallery's ongoing symptoms. He discussed her condition with Dr. Gerald Leglue, Ms. Vallery's physical medicine physician who she had been treating with since 2004.

Ms. Vallery explained that, during that time period, Dr. Leglue referred her to Dr. Anil Nanda, also a neurosurgeon, for a second opinion. Upon review of Ms. Vallery's prior x-rays, Dr. Nanda determined that the films revealed no clear evidence of fusion and that the films also revealed a fractured bone graft. Dr. Nanda explained that this type of finding is often seen in smokers and, in his opinion, the risk of non-fusion could be as much as two to three times higher for

2

smokers. He advised Ms. Vallery at that time that, if she chose the further surgical option that he was able to provide, he would require her to cease smoking before the procedure and that she would have to refrain from smoking. Ms. Vallery explained that she was able to ultimately stop smoking in order to proceed with the surgery.

In December 2006, Dr. Nanda performed this third fusion surgery, again at the C4-C5, C5-C6, and C6-C7 levels. Dr. Nanda explained that it was performed without complication. While Ms. Vallery alleged that she had lessened symptoms following this final fusion, she continued treating with physical medicine physicians for pain. Additionally, she underwent a breast reduction surgery due to neck and shoulder pain.

Ms. Vallery requested review by a Medical Review Panel, alleging that Dr. Drerup breached the standard of care in a number of respects, including the failure to detect the fractured bone graft and what she alleged was an incomplete fusion. The Medical Review Panel found that the evidence did not support the conclusion that he failed to comply with the appropriate standard of care as alleged.[2]

Ms. Vallery subsequently filed this matter against Dr. Drerup and Louisiana Medical Mutual Insurance Company, as Dr. Drerup's insurer.[3] At trial, Ms. Vallery again asserted that Dr. Drerup breached the applicable standard of care in

---

[2] The Medical Review Panel addressed Ms. Vallery's complaints against other physicians as well. As with Dr. Drerup, the Medical Review Panel found that evidence did not support Ms. Vallery's claim.

[3] Although Ms. Vallery's husband at the time joined Ms. Vallery as a plaintiff in the petition, the couple divorced prior to trial, and, as recognized in the transcript, Mr. Vallery transferred his interest in the suit to Ms. Vallery during the couple's property settlement. We also note that she is listed as the sole appellant in the motion and order of appeal. Therefore, we refer to Ms. Vallery as the singular plaintiff.

The petition also listed three radiologists as defendants. Those defendants, and LAMMICO, in its capacity as their insurer, were dismissed by summary judgment prior to trial.

failing to detect and report the fractured bone graft and incomplete fusion. Ms. Vallery also asserted that Dr. Drerup breached the standard of care in failing to advise her to stop smoking prior to and after her surgeries in order to assist the fusion process. This substandard care, Ms. Vallery alleged, caused both general damages and those associated with loss of income and increased medical expenses. Following a bench trial, the trial court rendered judgment in favor of Dr. Drerup. Written reasons for ruling reveal its determination that "Dr. Drerup treated Ms. Vallery appropriately and within the standard of care at all times."

Ms. Vallery appeals, asserting that the trial court erred in: 1) not finding a breach of the standard of care in failing to recognize the fractured bone graft and incomplete fusion; 2) finding that the plaintiff's post-surgical pain was attributable to myofascial pain rather than due to the fractured bone graft and incomplete fusion; 3) not addressing her claim that she had a right to know of the fractured bone graft and incomplete fusion; 4) refusing to allow her to call the defendant radiologists in rebuttal or to allow the introduction of their depositions into evidence; 5) admitting the Medical Review Panel Opinion in light of what she contends was a violation of La.R.S. 40:1299.47(E); and 6) in determining that Dr. Drerup had, in fact, informed her to stop smoking before the surgery.

**Discussion**

*Burden of Proof*

Louisiana Revised Statutes 9:2794 sets forth the burden of proof for medical malpractice actions, stating, in part, that:

> A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., . . . the plaintiff shall have the burden of proving:

4

(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians . . . licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, . . . within the involved medical specialty.

(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

"Appellate review of a trial court's findings in a medical malpractice action is limited." *Johnson v. Morehouse Gen. Hosp.*, 10-0387, p. 11 (La. 5/10/11), 63 So.3d 87, 96. In particular, the appellate court may not disturb factual findings absent manifest error or unless they are clearly wrong. *Id.* In conducting its review, the appellate court considers the record as a whole in determining whether there was a reasonable factual basis for the trial court's finding and whether the finding was clearly wrong. *Id.* In the event there are two permissible views of the evidence, the fact finder's choice between the two cannot be manifestly erroneous or clear error. *Id.* "However, if a witness's story is so internally inconsistent or implausible on its face that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based on a credibility determination." *Id.* at 96. We turn to consideration of Ms. Vallery's assignments.

*Standard of Care and Causation*

The trial court's findings of fact reveal its determination that the plaintiff failed to establish that Dr. Drerup breached the standard of care in not detecting the

fractured bone graft or in not diagnosing a failed fusion. Rather, the trial court found that the fusion process was a continuing one and that a complete fusion was not required under the standard of care. Additionally, the trial court credited Dr. Drerup's position that Ms. Vallery's continued complaints were myofascial in nature. The trial court noted that other physicians testified as to the myofascial origin of her pain as well. Within her assignments, Ms. Vallery argues that the trial court erred in failing to find that Dr. Drerup breached the standard of care by failing to detect the fractured bone graft and in not determining that the she had suffered from an incomplete fusion. She further challenges the trial court's acceptance of the defense theory that her pain resulted from a myofascial condition.

With regard to the detection of the fractured bone graft, it is unquestioned that Dr. Drerup did not identify Ms. Vallery's fractured bone graft occurring at the C4-C5 level after the second surgery. Ms. Vallery contends that the fracture should have been apparent to him in a series of x-rays taken after the second surgery. Ms. Vallery points out in her brief that Dr. Nanda identified the fracture on his initial visit with Ms. Vallery.

On this point, the trial court determined that:

> Dr. Rand Voorhies and Dr. Marcos Ramos testified unequivocally that Dr. Drerup did not breach the standard of care in any respect in this case. The [Medical Review Panel], after reviewing all the records and films, also found no breach of the standard of care. Dr. Drerup missed the fractured bone graft; however, Dr. Voorhies and Dr. Ramos both testified they probably would have missed it also if in Dr. Drerup's shoes, and they testified Dr. Drerup did not breach the standard of care in missing the fractured graft. The fractured graft can be seen in retrospect, and Dr. Drerup would have advised Ms. Vallery of the facture had he known. Regardless, Dr. Voorhies and Dr. Ramos agreed with Dr. Drerup that the facture was inconsequential. It did not cause any neurological condition requiring surgery. Both Dr. Voorhies and Dr. Ramos testified they would not

have treated this patient any differently and felt Dr. Drerup's treatment was appropriate in all respects. Dr. Anil Nanda also testified that he advised Ms. Vallery that she could "do nothing". The fractured bone graft would not have significantly changed her treatment plan because there was never any instability or neurological compromise.

We find no manifest error on this point. Rather, the trial court's findings are supported by the record. At trial, Dr. Drerup was able to identify the fractured bone graft from the films presented. When asked why he was not able to identify the fracture at the time he was treating Ms. Vallery, Dr. Drerup suggested that the bone grafts used for such procedures contain holes and that the fracture may not have been identified due to this feature. Dr. Rand Voorhies, Dr. Drerup's expert in the field of neurosurgery, confirmed Dr. Drerup's testimony, explaining that holes contained in the grafts used can appear to be a crack. Dr. Voorhies further stated that he would not describe the failure to detect the fracture as a breach of standard of care because it is not "a clinically significant finding[.]" He noted that, although radiologists are to point out abnormalities in their report, the radiologists reviewing the images at issue herein did not reference a fracture. Additionally, Dr. Marcos Ramos, a neurologist and member of the Medical Review Panel, testified that there was no breach in not recognizing the fractured bone graft. Accordingly, and notwithstanding the question of whether any causation of damages was associated with the fracture as commented upon by the trial court, we find that the record supports its conclusion regarding identification of the fractured bone graft.

Neither do we find that the evidence dictated a determination that Dr. Drerup breached the standard of care in not diagnosing a non-fusion as Dr. Nanda did. Dr. Voorhies explained that fusion occurs as a process and that the associated timeline varies individually. He testified that the degree of fusion is a matter of

interpretation and that, based upon the films presented, he did not find that Dr. Drerup should have acted differently. Similarly, the Medical Review Panel rejected Ms. Vallery's contention that she had suffered a non-fusion, stating:

> The panelists do not feel that the patient's persistent symptoms would relate to the alleged non-fusion, and further, the patient was not experiencing any evidence of instability. The films at issue herein demonstrate that these levels were progressing toward fusion; accordingly, there should not have been any attempt to re-fuse those levels. The bone graft may have fractured during surgery, but without evidence of instability, there is no basis to remove or replace the bone graft with the same or different type of graft, given the use of the plate and screws, and the apparent stability of the levels. The record does not reflect that Dr. Drerup misinterpreted any radiology films, and the claimant's allegation that there was at no time any fusion at any level is incorrect. . . . Notably, the records reflect that, despite the re-fusion surgery by Dr. Nanda, the patient continued to experience problems intermittently.

In light of this evidence regarding the process of fusion, the record supports the trial court's rejection of Ms. Vallery's argument in this regard.

Rather than being attributable to a non-fusion, Dr. Drerup determined that Ms. Vallery's ongoing pain complaints were of a myofascial nature, and not related to a failure to fuse. The trial court accepted Dr. Drerup's diagnosis, explaining that:

> Dr. Voorhies, Dr. Ramos, Dr. Nanda, Dr. Leglue and Dr. Michael Dole all agreed with Dr. Drerup's diagnosis of myofascial pain. Dr. Voorhies, Dr. Ramos and Dr. Drerup explained at trial that none of Ms. Vallery's complaints were consistent with a neurological condition. Her complaints were inconsistent and jumped from place to place which does not indicate a neurological problem. The breast reduction surgery and clinical findings and complaints after Dr. Nanda's surgery clearly show she had no neurological problems caused by any action or inaction by Dr. Drerup. These complaints and findings confirm a musculoligamentous problem, such as myofascial syndrome or fibromyalgia and negate any neurosurgical problem following Dr. Drerup's surgery. Further, the film show [sic] no clinically significant neurological impingement on the spinal canal and the construct remained in perfect position.

8

On this point, Dr. Leglue, Ms. Vallery's initial physical pain physician, explained that, in visits subsequent to the surgery performed by Dr. Nanda, Ms. Vallery continued to complain of pain. Dr. Leglue acknowledged that his notes from those visits, as late as 2008, revealed a diagnosis of myofascial pain. Dr. Michael William Dole, a physical medicine physician who treated Ms. Vallery upon a referral from Dr. Leglue, also opined that Ms. Vallery's complaints were myofascial in nature. Additionally, Dr. Nanda explained in deposition as follows when questioned regarding Dr. Drerup's myofascial pain diagnosis:

> Q.     The [Medical Review] Panel noted that based on their review of all the records in this case that the symptoms - - they did not feel the symptoms were related to the alleged nonfusion and the patient was not experiencing any evidence of any instability. As far as her symptoms, Dr. Drerup felt that they were, I think he said, myofascial in nature based on the description clinically [sic] to him. Would that be a reasonable diagnosis for a neurosurgeon to make based upon that clinical picture?
>
> A.     Completely reasonable.

Finally, defense counsel asked Dr. Voorhies at trial whether Ms. Vallery's continued need for narcotic medication in order to control pain even after surgery confirmed the myofascial pain diagnosis, Dr. Voorhies responded: "Yes, [] my understanding of myofascial is that, we don't know where the pain's coming from, and that would be my impression as well." In light of this testimony, we find no error in the trial court's rejection of Ms. Vallery's contention that a failed fusion was the cause of her complaints of pain.

Further, and on this basis, we find no merit in Ms. Vallery's third assignment of error wherein she contends that the trial court "committed legal error in failing to address [her] claim that she had a right to know her true and actual condition, i.e., that she had a fractured bone graft and incomplete fusion from C4-

C7." Importantly, this argument presumes that Ms. Vallery did, in fact, have an incomplete fusion. As discussed with regard to causation, however, the record does not dictate such a clear diagnosis as to the progression of the fusion. Additionally, we have above concluded that the record supports the determination that Dr. Drerup did not breach the standard of care in his interpretation of the radiology films. Thus, it cannot be said that Dr. Drerup should have informed Ms. Vallery of a condition that he was unaware of or that did not exist.

These assignments lack merit.

*Information Regarding Smoking*

Ms. Vallery alleged at trial that Dr. Drerup did not inform her prior to the two surgeries that he performed for her that smoking could inhibit the smoking process. She contended that she would have stopped smoking had she been aware that she was increasing her risk of a non-fusion. While Dr. Drerup acknowledged that his records did not reflect that he provided this information to Ms. Vallery, he testified that he had advised Ms. Vallery of this several times before both surgeries. He further testified that Ms. Vallery informed him that she would not stop smoking.

The trial court rejected Ms. Vallery's contention in this regard, finding that:

> Lastly, advising a patient to stop smoking prior to surgery is not required by the standard of care as testified by Dr. Voorhies, Dr. Ramos and Dr. Nanda. Notwithstanding, despite the inconsistent testimony, the evidence shows Dr. Drerup and his office did, in fact, advise Ms. Vallery to stop smoking on multiple occasions. The Court did not believe Ms. Vallery and her husband on this issue. Dr. W. Robert Hudgins offered his expert opinion that the smoking advice was the standard of care. The Court found the other medical experts more credible.

On appeal, Ms. Vallery challenges this finding and suggests that Dr. Drerup's records, which do not reflect advice as to smoking, should be considered

10

inherently reliable and supportive of her testimony that she was not instructed to stop smoking. Notwithstanding the above-findings regarding the progression of the fusion while under Dr. Drerup's care and causation, we observe that the trial court's ruling in this case is essentially a credibility determination. In addition to favoring Dr. Drerup's version of events, the trial court specifically rejected Ms. Vallery's testimony and that of her husband. We do not re-evaluate that testimony on appellate review. Additionally, the trial court correctly observed that expert testimony was introduced indicating that the applicable standard of care does not require advising a patient to stop smoking prior to this type of surgery.

This assignment lacks merit.

*Rebuttal - Depositions*

Initially, Ms. Vallery named three radiologists as defendants in this matter, alleging in her petition that the radiologists "fell below the standard of care of radiology in misinterpreting radiology and/or not reporting the fractured bone graft." However, those radiologists were dismissed by summary judgment and neither party called the radiologists as witnesses. At the close of Dr. Drerup's case, Ms. Vallery sought to introduce the depositions of the three radiologists in rebuttal. Particularly, Ms. Vallery contended that defense questioning of various physician experts touched upon whether the radiologists reported the fractured bone graft. As established above, the radiologists did not reference the fracture in the x-ray reports. Ms. Vallery argued to the court that the depositions were necessary in order for the radiologists to explain why the fracture was not reported.

The trial court excluded the depositions in rebuttal, finding the depositions to be hearsay. Further, the trial court denied the request to hold the case open so that the radiologists' testimony could be presented, noting the reporting of the

11

fractured graft was an issue throughout the trial and the radiologists could have been called as witnesses in Ms. Vallery's case-in-chief. Instead, the trial court allowed Ms. Vallery to proffer the depositions for review on appeal. On appeal, Ms. Vallery contends that the trial court denied her right to present a rebuttal argument by this ruling.

Pursuant to La.Code Evid. art. 611(E), a plaintiff in a civil case has the right to rebut evidence adduced by their opponents. However, rebuttal evidence must be confined to new matters raised by the defense. *Bickham v. Riverwood Intern. Corp.*, 42,122 (La.App. 2 Cir. 10/8/07), 966 So.2d 820. "The trial court has great discretion in controlling the conduct of the trial and the presentation of evidence, including the power to admit or refuse to admit rebuttal evidence." *Id.* at 824. *See also* La.Code Evid. art. 611(A). In this case, the trial court correctly recognized that Dr. Drerup's identification of the fractured bone graft was at issue throughout these proceedings. Further, it was clear that he reviewed the x-rays in light of accompanying reports that did not specifically reference the alleged anomalies suggested by Ms. Vallery. Therefore, we find no abuse of discretion in the trial court's determination that the radiologists' explanations regarding their report, apparently contained within the proffered depositions, was not targeted toward new evidence developed strictly during Dr. Drerup's defense. Accordingly, we find no abuse of discretion in the trial court's ruling.

This assignment of error lacks merit.

*Medical Review Panel Opinion*

In her final assignment of error, Ms. Vallery questions the introduction of the Medical Review Panel Opinion, which was rendered upon the panel's meeting via telephone conference. In pre-trial proceedings, Ms. Vallery objected to the

introduction of the opinion, suggesting that it violated La.R.S. 40:1299.47(E), which provides for the Medical Review Panel's consideration as follows:

> E. Either party, after submission of all evidence and upon ten days notice to the other side, shall have the right to convene the panel at a time and place agreeable to the members of the panel. Either party may question the panel concerning any matters relevant to issues to be decided by the panel before the issuance of their report. The chairman of the panel shall preside at all meetings. Meetings shall be informal.

Ms. Vallery contended that, because the Medical Review Panel rendered its decision following teleconference rather than following an "in-person" meeting, it did not satisfy the statutory requirement. Further, she suggested that, because the matter before the Medical Review Panel was radiology intensive, a conference call approach was inappropriate and that, by convening the panel through a call, the chairman exceeded the authority granted by the statute. The trial court rejected this argument, noting that the parties would be able to cross examine the panel members at trial as to whether the decision was rendered upon consideration of all of the evidence.

We find no error in the trial court's ruling. Notably, La.R.S. 40:1299.47 provides only that either party may "convene" the panel. The statute does not define either "convene" or "meetings." Neither is there a distinction between such a meeting by teleconference or by an in-person gathering. Additionally, La.R.S. 40:1299.47(H) provides, in part, that: "Any report of the expert opinion reached by the medical review panel shall be admissible as evidence in any action subsequently brought by the claimant in a court of law[.]" Given the positive statement of admissibility of the Medical Review Panel opinion, and the general reference only to the "convening" of the Medical Review Panel, we find no error in

13

the trial court's ruling that the Panel's meeting by teleconference did not exceed the authority of La.R.S. 40:1299.47(H).

This assignment of error lacks merit.

## DECREE

For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this proceeding are assessed to the plaintiff—appellant, Rebecca Vallery.

**AFFIRMED.**